ECONOMY LIGHT & POWER CO. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 21, 1919.)

No. 2525.

1. NAVIGABLE WATERS ⬮⟹22(1)—DAMS—CONTROL BY STATE.

Under Act Sept. 19, 1890, providing ·that dams or other structures in navigable waters of the United States shall not be built without authority of the Secretary of War, and Act March 3, 1899, § 9 (Comp. St. § 9971), relating to navigable waters wholly within the state, dams or other structures may be built only by joint assent of the national and state governments.

2. NAVIGABLE WATERS ⬮⟹22(1)—DAMS—WATERS LYING WHOLLY WITHIN A STATE—STATUTES—APPLICATION.

Act March 3, 1899, under which dams or other structures may be built in or over navigable streams wholly within a state only by joint assent of the national and state governments, should be construed to refer to navigable capacity and not rigidly restricted to streams floating interstate or foreign commerce at the time of its passage.

3. NAVIGABLE WATERS ⬮⟹3—ORDINANCES AS TO GOVERNMENT OF NORTHWEST TERRITORY.

The purposes of the Ordinance of July 13, 1787, for the government of the Northwest Territory, was to retain forever the free and unrestricted use to the people of the country of any or all waterways then known to be navigable, or waterways that might thereafter be used by the people in the more remote parts of the country for the purposes of commerce.

4. NAVIGABLE WATERS ⬮⟹1(1)—NECESSITY FOR USING.

The fact that shipping methods have dispensed with the necessity for using the carrying places in the Desplaines river does not lessen in any degree the value of the navigable portions of the stream, nor render them not navigable.

5. NAVIGABLE WATERS ⬮⟹1(1)—"NAVIGABILITY."

Navigability does not depend on the amount of tonnage, depth of water, width of stream, character of craft, or relative ease or difficulty of navigation, nor the use at some time for commerce; navigability being determined by natural conditions.

6. NAVIGABLE WATERS ⬮⟹1(6)—DESPLAINES RIVER.

The Desplaines river in Illinois is a navigable stream, and a dam cannot be constructed therein without the consent of the United States government, under Act March 3, 1899, § 9 (Comp. St. § 9971).

7. COURTS ⬮⟹372(1)—DECISIONS OF STATE COURTS—NAVIGABLE WATERS.

A federal court need not follow a decision of the Supreme Court of Illinois as to the navigability of the Desplaines river.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Bill by the United States against the Economy Light & Power Company. From a decree in favor of the plaintiff, defendant appeals. Affirmed.

December 14, 1909, the United States filed its bill of complaint against the Economy Light & Power Company, alleging that said company had, without the consent of Congress and without authority of the Legislature of Illinois, commenced the construction of a dam in the Desplaines river at a point in Grundy county, Ill., and that the portion of the Desplaines river in which the construction of the dam had been commenced was navigable water of the United States, and praying the court to order, adjudge, and

⬮⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

decree said Desplaines river to be a navigable river and one of the navigable waters of the United States; that the portion of the dam constructed be held to be in violation of the provisions of section 9 of the act of March 3, 1899 (30 Stat. 1151, c. 425 [Comp. St. § 9971]), and ordering its removal, and that the defendants and its officers and agents and all persons acting under them be enjoined perpetually from placing any further obstruction in said river, and from doing any other act or performing any other work in connection with the construction of said dam.

On February 28, 1910, the defendant filed its answer, admitting the commencement of the construction of a dam as alleged, but denying the navigability of the portion of the Desplaines river in which said dam was being constructed. A very large amount of evidence was taken, the abstract containing 3,186 printed pages. From a decree entered May 25, 1917, perpetually enjoining the defendant, its officers, agents, etc., as prayed, defendant appeals.

Frank H. Scott, of Chicago, Ill., for appellant.

Charles F. Clyne and Clarence N. Goodwin, both of Chicago, Ill., for appellee.

Before BAKER and EVANS, Circuit Judges, and SANBORN, District Judge.

SANBORN, District Judge (after stating the facts as above). *The Desplaines up to 1894.*—The Chicago-Desplaines-Illinois water route, used from 1673 to 1825 by explorers and in the fur trade, was made up of portions of the Chicago and Desplaines rivers, now some eight miles apart. It includes the Chicago river from its mouth on Lake Michigan to Robey street, Chicago, on the West fork of the South branch, thence westerly, by water or portage, to Mud Lake, about two miles, thence to the Desplaines near Riverside, two miles, down the river to the Illinois, made by the confluence of the Desplaines and Kankakee. The part of this route between the Chicago and Desplaines is called the Chicago divide. The Desplaines river rises near the county line between Racine and Kenosha counties, Wis., and runs in a southerly direction, parallel substantially to the west shore of Lake Michigan, through Lake and Cook counties, Ill., until it reaches Riverside, some 11 miles from the mouth of the Chicago river; thence it takes a southerly direction through Cook and Will counties to its confluence with the Kankakee river near the east line of Grundy county. The original area of the Desplaines river basin was 1,428 square miles, and with the changes which have been made the present area is taken at 1,392 square miles. The Desplaines river basin is usually divided into the upper Desplaines and the lower Desplaines; the term upper Desplaines applying to that portion above Riverside. The upper Desplaines basin has an area of 633 square miles, a general length of about 60 miles, and a general width of about 10 miles, and is a true basin—has practically no true tributary basins, except Salt creek, which has about 110 miles, entering at Riverside. It is a rolling country, originally covered with one-half to one-third in timber. Its general declivity by its flood plane is about 1½ feet per mile. The river bed is cut as a groove in a prairie, rather than the ordinary river bed, with an overflow or flood plane on either side. Originally it had a considerable quantity of swamp, marsh, and bog at headwaters, and in Lake county and in portions of Cook county and also upon Salt creek in Du Page county,

and a lake development in Lake county, from which that county derives its name.

The characteristics of the Lower Desplaines basin, that portion below Lyons or Riverside, are that it covers by the general course of the valley about 42 miles to the confluence with the Kankakee, and has a total descent of about 102 or 103 feet. It has a true subbasin in the Du Page river, which covers 366 square miles. The total area is 795 square miles below Riverside, but outside of the Du Page river this area is only 429 miles. The valley in itself is not a characteristic valley, like the Upper Desplaines, but has the appearance of being an old water course or outlet from the Great Lakes, in which the modern stream follows through remnants of an ancient stream of much greater magnitude, a succession of pools and wide expanses, with intermediate channels, which have not yet developed to their proper proportions, connecting these pools and water stretches. The river valley or river has two considerable tributaries aside from the Du Page, in Hickory creek and Jackson creek, but otherwise the drainage is essentially marginal or shore drainage.

Beginning within a mile of the township line between Riverside and Lyons is a long level expanse, known as the 12-mile level, consisting of a succession of water expanses and connecting straits or channels, from 150 feet up to a quarter or an eighth of a mile in width, in places, and with varying depths up to 10 or 15 feet in localities; these water expanses having a mud bottom which seem to be more vegetable deposits than alluvial, and which indicate originally much greater depth, and margined in by a vegetable growth. These expanses were for a long time used as ice fields by the ice interests which had their market in Chicago. Below the 12-mile level is a succession of ponds and shallow connections in the rock, like Goose Lake and Round Lake, and others between Romeo and the 12-mile level. This whole stretch is well described in the original land survey as a succession of swamps, ponds, lakes, and marshes connected by currents.

Below Romeo, which is 6 miles below Lyons, there is a declivity at the rate of 7 feet per mile from the Romeo highway down to the head of Lake Joliet, a distance of 11 miles, pretty uniformly distributed. Thence for a distance of about 13 miles, between that and the mouth of the river, there are some 10 miles occupied by pools, or Lake Joliet, which has a length of nearly 6 miles and has a width of 500 to 900 feet, and a depth originally up to 15 or 20 feet, and then a pool of over a mile in length immediately below Treat's Island rapids; then Lake Du Page, some 13 miles in length, with a width of about 350 feet on the average, and with a depth of 10 feet and upwards, these pools being connected by intermediate rapids like the one at Treat's Island and the one near the mouth of the Kankakee, and the reach of swifter and shallower water between the pool below Treat's Island and the head of Lake Du Page. These distances are given only approximately, and to show some of the characteristics of the stream. This description applies to the Desplaines river as it was known up to about 1894, when the Sanitary District works changed the conditions very radically through the valley above the city of Joliet, between there and Lyons

or Riverside. The proportion of the Desplaines river itself from the end of the portage road to its mouth, or confluence with the Kankakee, that would consist of pools, would be about 60 per cent. The total distance from the portage road to the confluence with the Kankakee is about 44.5 miles. In that distance there would be the so-called 12 mile level, which is 13.7 miles, Lake Joliet, the pool below Treat's Island, and Lake Du Page, aggregating 10 miles, and Goose Lake and Round Lake, and some other stretches unnamed, amounting in all to about 27 or 28 miles, out of a total of 44.5. The distance from dam No. 1 to the mouth of the river is 15.72 miles, of which about 10 miles consists of pools. This stretch is now more particularly in question. The condition of these pools, if the Desplaines river were to run dry, that is, no water pass from pool to pool, would be that Lake Joliet would be practically available for boats as before; the depth in it being from 20 to 25 feet at the maximum, and a large proportion of it having more than 10 feet.

The distance from Lake Michigan to the mouth of the Desplaines river is 58.32 miles, made up as follows:

| | | |
|---|---|---|
| From Lake Michigan to Ashland avenue, which is substantially at the forks of the South Branch of the Chicago river........ | 5.5 | miles |
| Ashland avenue to Ogden dam, which is across the old portage slough, on the range line, range 12, 13, north of Summit...... | 8.3 | |
| The so-called 12-mile level, actual length...................... | 13.7 | |
| From 12-mile level to Isle la Cache............................ | 6.7 | |
| Isle la Cache to dam No. 1.................................... | 8.4 | |
| Dam No. 1 to head of Lake Joliet.............................. | 3. | |
| Head of Lake Joliet to mouth of Desplaines river.............. | 12.72 | |
| | 58.32 | |

A gauge record kept at Riverside for a period of 20 years, from the year 1886 to 1904, both inclusive, showed the water stood at above 18 feet on the Riverside gauge an average of 4.3 days per year; at or above 13.8 feet an average of 47.6 days per year; at or above 13 feet an average of 73.2 days per year; at an elevation of 12.4 feet an average of 116.2 days per year; at or above 11.85 feet an average of 190.65 days per year.

When the water stood at 10.5 at the head of the 12-mile level at Summit, corresponding to 13 feet on the Riverside gauge, and a volume of 600 second feet, the water in the portage swamp and channels connecting with the Desplaines river would be flowing over to the Chicago river to the extent of the capacity of the trench that existed below this level. During the 20-year period referred to water would have flowed over the Chicago divide on an average of 73.2 days per year.

At all elevations when the water at Summit stood at 11.73 or above, corresponding to an elevation of 13.8 on the Riverside gauge, and to a volume of 1,052 second feet, a boat drawing 15 inches of water could pass from the Desplaines river across the Mud Lake region and over the continental divide and into the Chicago river without making any portage between them. Such condition would have prevailed during the 20-year period an average of 47.6 days per year.

At an elevation between 13.8 feet and 13 feet, the water would

gradually diminish in depth on the Chicago divide, and when a portage became first necessary it would be about 1 mile in length, and when it reached the level of 10.5 it would be 2 miles in length between the West fork at Western avenue, Chicago, and the beginning of deep water in Mud Lake.

At an elevation between 13 feet and 12.4 feet on the Riverside gauge, boats could no longer pass between Mud Lake and the Desplaines river, except light, and be entirely stopped, and a portage of 1 or 2 miles would be required between Mud Lake and the Desplaines river, in addition to the portage of 2 miles between the West fork and Mud Lake. In this condition there would be a substantial navigable depth of 15 inches between Isle la Cache and Mount Juliet, a distance of 11 miles. Isle la Cache is located in the Desplaines river on the township line between the towns of Du Page and Lockport.

At an elevation between 12.4 feet and 11.85 feet on the Riverside gauge, the Chicago divide would require the two portages mentioned, or the alternative of a 7-mile portage between the waters of the Chicago river and the Desplaines. The Desplaines would have a navigable depth of 12 to 15 inches, with possibly some deficiency in one or two localities; from Romeo down to the head of Lake Joliet there would be sufficient water for a boat at the higher stages to go down partially loaded, and at the lower stages to go down light, but at the lower stages the cargo itself would require a transfer over the 11 miles from Isle la Cache to Mount Juliet. All the river below Lake Joliet would be navigated by discharging the cargo in part or wholly at Treat's Island, and near the mouth of the river.

There has been no time when the Desplaines river ran absolutely dry, and there was not any water passing from pool to pool, except as it was artificially produced by the abstraction of water from the Desplaines either for canal purposes during the time in which the Desplaines was used in that connection as a feeder, or through the cutting down of the Chicago divide and the draining of the water towards Chicago at medium and low stages.

*Changes in Desplaines River.*—Various changes have been made in the Desplaines river from its condition as it existed in a state of nature. The portage swamp region lying east of the range line at Summit has been drained and made tributary to the Chicago river, except so much as is tributary to the canal; this area amounting to 48 square miles. There has been added from the Sag region an area of about 12 square miles, making the change below Lemont 36 square miles to be deducted from the former areas. The deficiency of rainfall, averaging 2.9 inches per year during the period of 20 years from 1887 to 1910, computed from the Riverside gauge, would produce a deficiency in run-off of probably 15 or 20 per cent., and the effect of that would be to diminish both the volume and duration for the stages of water exhibited in the table referred to. There is also a deficiency in the run-off, due to the substantial clearing away of the forest-covered area of 5 per cent. There are changes which have affected the distribution of the run-off. The clearing away of the forests has destroyed an element of control, which has diminished the control and the duration of the stages of water; and in addition the restriction of ponds and lakes

and the drainage of wet lands, bogs, and marshes, and particularly the destruction of a special control existing in the portage swamp region and 12-mile level, all of which under natural conditions prolong the stages of water.

There have been radical changes in reference to the depletion of the water in the Desplaines river from a state of nature. The first change of significance was due to the construction of the Illinois and Michigan Canal in 1848. The effect of the construction of that canal upon the water in the lower Desplaines was a reduction of the drainage of the river below the dams at Joliet to less than 250 square miles out of a total of 1,428 square miles. Further interference arose from the fact that the location of the canal along the south and east side of the valley caused the hill drainage to be turned in part toward Chicago, and on the tangent between Summit and Bridgeport (in the southwestern part of Chicago) it ran across the south arm of Mud Lake, cutting off the drainage and reservoir control of that portion of the portage swamp region lying to the south of the canal. From 1866 to 1871 the Illinois and Michigan Canal was deepened, causing interference with the flow of the river. Further interference was caused by the construction of ditches in the Mud Lake region, and by the erection of pumping works at Bridgeport in 1883. Interference also occurred by reason of the construction of the river diversion by the Sanitary District in 1893–94, by which the Desplaines river was shifted to the west and north side of the valley, so as to leave a site between the river as thus changed and the Illinois and Michigan Canal for the construction of the drainage canal itself. Interference has also been caused by inhabitation which has cut away forests, thus curtailing the run-off, and there has been drainage of swamps and wet lands, and the destruction of ponds and lakes. The Sanitary and Ship Canal, which was completed in 1892, joins the Desplaines at dam No. 1, 31.6 miles from Riverside, from which point its waters flow into and increase the current of the Desplaines.

These various changes have materially interfered with the flow of the river, and the conditions in the basin itself have been changed by the actual distribution of the flow. The Desplaines river has an impermeable soil bottom, and the control that was exercised was surface control largely. The destruction of this surface control has affected the flow of the water much more radically than would have been the case had the ground been permeable.

*Use of Desplaines River.*—From the latter part of the seventeenth century through the first third of the nineteenth century men engaged in the fur trade passed up and down the Chicago and Desplaines rivers in canoes and flatboats very regularly. Fourteen specific instances of the use of the Desplaines down to the year 1830 are shown in the evidence, as follows: Trips to Chicago: Joliet and Marquette, 1673; Perrault, 1783; Joutel, 1688; Hubbard, 1819; Ebenezer Child, 1821; Tonty, 1680; La Salle, 1681; Fonda, 1825. Trips from Chicago: Father Membre, 1682; St. Cosme, 1698; Hubbard, 1818; Marquette, 1674; Howard, 1790; Furman, 1830. Very many other trips made during the same period, not so well authenticated, are disclosed in the

evidence, and numerous historical references to the Chicago-Illinois route. No doubt other instances of its use may properly be inferred. It was employed by the American Fur Company down to 1825, and then abandoned for other routes. The trial judge found, as the record shows, that there is no evidence of actual navigation within the memory of living men, and therefore there would be no present interference with navigation by the building of the proposed dam. But it was held that the evidence shows the Desplaines a navigable water of the United States, preserved as such by the legislation of Congress.

In the early days the fur trade was a leading branch of commerce in the Western world, and this trade was one of the characteristics of the Desplaines river. Large quantities of supplies of various kinds needed by the settlers in a new country were also transported over the Desplaines during the same period in boats of the size and character then commonly used in river commerce; this transportation being carried on between Chicago, St. Louis, and other points. Canoes of several tons burden were used; some were 35 feet long by 6 feet wide, some 33 feet long by 4½ feet wide, worked by paddles and occasionally a sail, and had a crew of eight men, carrying as much as 6,000 pounds of freight as well as 1,000 pounds of provisions. The pirogues were manned by six or seven oars; the bateaux were larger than the pirogues; the Durham boats were heavy freight craft, 60 feet long, 8 feet wide, 2 feet deep, with a capacity of 15 tons, drawing 20 inches of water.

Commerce of this character existed until about the year 1825. After that year the fur trade, having receded to interior portions of Illinois, was reached more generally by horses. After the year 1848, when the Illinois and Michigan Canal was constructed, commerce that had formerly been carried on the Desplaines river was carried on the canal. Radical changes had taken place in the condition of the river as heretofore shown, which resulted in a diminution of the flow in the river, and this was one of the causes for the nonuse of the river.

Up to 1889 several dams had been built across the Desplaines river, to wit: Daggett's Mill, one half mile below Lockport; dam No. 1, 10 feet high, belonging to the state, Joliet; dam No. 2, 8 feet high, one-half mile below dam No. 1, also belonging to the state; Adams dam, 6 feet high, and less than a half mile below dam No. 2. Formerly a dam existed at the foot of Lake Joliet, at Treat's Island, and also one at the foot of Lake Du Page. These have long been abandoned. There are at the present time no dams in the Desplaines between dam No. 1 and the mouth of the river. Some of these dams were constructed as early as the year 1835, and their existence in the river was a source of obstruction to the commerce that had formerly been carried on. There are also a considerable number of bridges of various kinds across the river.

*Is the river navigable within the Act of 1899?* The main question in the case is whether the evidence shows the Desplaines a navigable stream of the United States, or one capable of bearing interstate commerce via the Illinois and Mississippi, at the time of the passage of the acts of 1890 and 1899. If the river be decided navigable in fact,

though not used for navigation, the further question is whether the words "navigable river, or other navigable water of the United States," includes a stream of navigable capacity, but not actually used in transportation for the past 75 years. In other words, does the act of 1899 refer only to streams then actually used for interstate commerce, or as well to rivers formerly navigated, like the Wisconsin, Rock, and hundreds of other streams of perfect navigable capacity, but whose use long ago ceased as an instrument of commerce (except for water powers)?

[1] The act of 1890 (Act Sept. 19, 1890, c. 907, § 7, 26 Stat. 454) provides that dams or other structures in navigable waters of the United States shall not be built without authority of the Secretary of War, and the act of 1899 that when such navigable waters are wholly within a state, such structures may be built under authority of the state Legislature if the plans are submitted to and approved by the Chief of Engineers and the Secretary of War. Under this legislation it has been established that dams or other structures may be built only by joint assent of the national and state governments. The effect of the act of 1899, "reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a state, depend upon the concurrent or joint assent of both the national government and the state government. The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such authority, obtain also the assent of the state acting by its constituted agencies." Cummings v. Chicago, 188 U. S. 410, 23 Sup. Ct. 472, 47 L. Ed. 525, approved in Gring v. Ives, 222 U. S. 370, 32 Sup. Ct. 167, 56 L. Ed. 235; Simpson v. Shepard, 230 U. S. 352, 408, 33 Sup. Ct. 729, 57 L. Ed. 1511, 1543, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Montgomery v. Portland, 190 U. S. 89, 23 Sup. Ct. 735, 47 L. Ed. 965. See, also, Cobb v. Lincoln Park, 202 Ill. 427, 67 N. E. 5, 63 L. R. A. 264, 95 Am. St. Rep. 258.

It is argued that the act of 1899 was passed under the constitutional power to regulate interstate commerce, and as no such commerce on the Desplaines then existed the statute can have no application, and that if the statute be construed to reach beyond this it was to that extent beyond the legislative power Even so it might be sustained under the war power. We have lately had a significant reminder of the inadequacy of railroad transportation in a time of stress.

[2] But, however this may be, we think streams of actual navigable capacity, but not now used for interstate commerce, are within congressional power to preserve for purposes of future transportation, and that the act of 1899 applies to such streams. If this is not the proper construction, very few interstate streams are within its terms. The Wisconsin river, that great water route of early times between the St. Lawrence and the Mississippi, could be destroyed if the state permitted. The Rock river in Wisconsin and Illinois, a stream in its natural state completely navigable from Lake Koshkonong to the Mississippi,

would be under no government protection, however important for future need. It might be covered with business blocks in cities lying upon it, as was permitted by the Wisconsin Supreme Court in State v. Carpenter, 68 Wis. 165, 31 N. W. 730, 60 Am. Rep. 848. Hundreds of like streams, immensely important to the future welfare of the country, on this theory could never come within the reach of congressional power, except possibly through restoration by the states. We are unwilling to assent to this narrow view of the purpose of the act of 1899, and think it should be construed to refer to navigable capacity (which is the test of navigable water), and not rigidly restricted to streams floating interstate or foreign commerce at the time of its passage. The question has never been decided by the Supreme Court or other federal tribunal.

The disposition of this case upon these facts may therefore well be narrowed down to the question: Was the Desplaines river navigable in its natural condition?

[3] The purpose of the provision referred to in the Ordinance of 1787 was not to declare or make the Desplaines river, or other waterways within the ceded territory, navigable waters of the United States, but only to define rights which depend on its existence. Illinois v. Economy Light & Power Co., 234 U. S. 497, 523, 34 Sup. Ct. 933, 58 L. Ed. 1429. A further purpose was to retain forever the free and unrestricted use to the people of the country of any and all waterways then known to be navigable, or waterways that might thereafter be used by the people in the more remote parts of the country, for the purposes of commerce. In respect to waterways no additional power was granted by the ordinance to the newly created territory, either at the time of the cession or in 1818, when Illinois was admitted to the Union, over the power held by the original 13 states, and the United States relinquished or lost none of its original power and control over the specific things included within its jurisdiction, one of the most important of which was the waterways.

The purpose of the Ordinance of 1787 is clearly stated by the court in The Montello, 20 Wall. 430, 444 (22 L. Ed. 391):

"To preserve the natural character of all the rivers leading into the Mississippi and St. Lawrence, and to prevent a monopoly of their waters, was the purpose of the Ordinance of 1787 declaring them to be free to the public."

It is immaterial to inquire whether the ordinance is still in force, or was superseded by the Illinois Enabling Act, or the act of admission, because the same principle is preserved in those statutes, and in the Illinois Constitution. It is very evident that from the earliest days the intention of Congress has been to retain in the public for all time the right to the use of streams of navigable capacity. Act Cong. May 18, 1796, c. 29, 1 Stat. 464, entitled "An act providing for the sale of lands of the United States in the territory northwest of the river Ohio, and above the mouth of the Kentucky river," provides in section 9:

"And be it further enacted that all navigable rivers within the territory to be disposed of by virtue of this act, shall be deemed to be and remain public highways." (Comp. St. § 4918.)

Act Cong. March 26, 1804, c. 35, 2 Stat. 279, entitled "An act making provision for the disposal of public lands in the Indiana Territory, and for other purposes," provides in section 6:

"That all navigable rivers, creeks and waters, within the Indiana Territory, shall be deemed to be and remain public highways."

[4] The contention of counsel for appellant that the carrying places between the streams cannot be held to be within the intent of Congress in preserving the right to the use of navigable streams, is not material in this case, for the reason that in the progress and improvement in the means and methods of transporting commerce those carrying places have become unnecessary. The fur trader of the early days had but one way to make his trip from Chicago to St. Louis; the waterways and the carrying places between. But the fact that changing methods have dispensed with the necessity for using the carrying places does not lessen in any degree the value of the navigable portions of the streams. It is also to be noted that the statutes of 1796 and 1804 referred to do not mention carrying places, but only refer to the waterways. If the carrying places were deemed of equal importance with the waterways they would undoubtedly have been mentioned in these acts.

In the leading case of The Montello, 87 U. S. (20 Wall.) 430, at page 441, 22 L. Ed. 391, the court said:

"And, independently of the Ordinance of 1787, declaring the 'navigable waters' leading into the Mississippi and St. Lawrence to be 'common highways,' the true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which rafts of lumber of great value are constantly taken to market.

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. It is not, however, as Chief Justice Shaw said ([Rowe v. Granite Bridge Corp. (Mass.)] 21 Pick. 344), 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.' * * * But the vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce. If this be so the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sand bars."

In Miller v. Mayor of New York, 109 U. S. 385, at page 395, 3 Sup. Ct. 228, at page 234, 27 L. Ed. 971, the court said:

"The power vested in Congress to regulate commerce with foreign nations and among the several states includes the control of the navigable wa-

ters of the United States so far as may be necessary to insure their free navigation, and by 'navigable waters' are meant such as are navigable in fact, and which by themselves or their connection with other waters form a continuous channel for commerce with foreign countries or among the states"—citing The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999.

In The Daniel Ball, 10 Wall. 557, at page 563, 19 L. Ed. 999, the court said:

"Those rivers must be regarded as * * * navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States, * * * when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water."

In St. Anthony Falls Water Power Co. v. Board of Commissioners, 168 U. S. 349, 18 Sup. Ct. 157, 42 L. Ed. 497, the Mississippi river at and above St. Anthony Falls, Minneapolis, was held navigable. The court say:

"In order to be navigable, it is not necessary that it should be deep enough to admit the passage of boats at all portions of the stream."

[5, 6] Navigability does not depend on the amount of tonnage, depth of water, width of the stream, nor the use at some time for commerce. Navigability is determined by natural conditions. Gaston v. Mace, 33 W. Va. 14, 10 S. E. 60, 5 L. R. A. 392, 25 Am. St. Rep. 848. Neither character of craft nor relative ease or difficulty of navigation are tests of navigability. State v. Pacific Guano Co., 22 S. C. 50. "The test of navigability is navigable capacity without regard to the character of the craft, the business done, the ease of navigation, the surroundings of the stream." Heyward v. Farmers Mining Co., 42 S. C. 139, 19 S. E. 963, 20 S. E. 64, 28 L. R. A. 42, 46 Am. St. Rep. 702. In Stratton v. Currier, 81 Mo. 497, the court held as correct an instruction that, the stream being of sufficient capacity to float logs, the public had a right to its use for that purpose. So in this case, the Desplaines river having the capacity to carry interstate and foreign commerce, the public has the right to its use. In Moore v. Sanborne, 2 Mich. 519, 59 Am. Dec. 209, the court holds that navigability consists in the capacity for valuable floatage. This case also holds that the Ordinance of 1787 supersedes the common-law doctrine of the necessity of usage or custom to establish a public right. In Burroughs v. Whitwam, 59 Mich. 279, 26 N. W. 491, the court held that the Ordinance of 1787 was intended to apply to such streams as were then common highways for canoes or bateaux in the commerce between the northwestern wilderness and the settled portions of the United States and foreign countries, and to such rivers not then in use as would by law be embraced in the definition of navigable waters. In Ten Eyck v. Town of Warwick, 75 Hun, 562, at page 566, 27 N. Y. Supp. 536, at page 539, the court follows the reasoning in many of the cases cited, and says:

"That is, streams must be capable, in their natural condition, of floating commodities to market"—citing and quoting Morgan v. King, 35 N. Y. 461, 91 Am. Dec. 58.

In the latter case the court said:

"The true rule is that the public have a right of way in every stream which is capable, in its natural state and its ordinary volume of water, of transporting, in a condition fit for market, the products of the forests or mines, or of the tillage of the soil upon its banks. * * * Nor is it essential to the easement that the capacity of the stream, as above defined, should be continuous, or, in other words, that its ordinary state, at all seasons of the year, should be such as to make it navigable. If it is ordinarily subject to periodical fluctuations in the volume and height of its water, attributable to natural causes, and recurring as regularly as the seasons, and if its periods of high water or navigable capacity ordinarily continue a sufficient length of time to make it useful as a highway, it is subject to the public easement."

In Wadsworth, Adm'r, v. Smith, 11 Me. 278, 26 Am. Dec. 525, it is held:

"Those [streams] which are sufficiently large to bear boats or barges, or to be of public use in the transportation of property, are highways by water, over which the public have a common right."

In Brown v. Chadbourne, 31 Me. 11, at page 22, 50 Am. Dec. 641, the court said:

"A distinguishing criterion consists in the fitness to answer the wants of those, whose business require its use. Its perfect adaptation to such use may not exist at all times, although the right to it may continue, and be exercised whenever an opportunity occurs. In many rivers, where the tide ebbs and flows, the public are deprived of their use for navigation during the reflux of their waters. A way, over which one has a right to pass, may be periodically covered with water. In high northern latitudes, most fresh water rivers are frozen over during several months of the year."

The statement, "A way, over which one has a right to pass, may be periodically covered with water," gives rise to the suggestion that a river in the latitude of the Desplaines is ordinarily frozen over during some of the winter months, and in a new country, where the roads, if any, are very poor and inadequate, such a river would afford an excellent highway, at least in many places, for teams drawing sleighs. In Lewis v. Coffey County, 77 Ala. 190, at page 193 (54 Am. Rep. 55), the court said:

"We do not understand that, to constitute a navigable stream, it is requisite there shall be sufficient water for the common uses of trade and commerce during all seasons of the year. It must, however, as the results of natural causes, be capable of valuable floatage periodically during the year, and so continue long enough at each period to make it susceptible of beneficial use to the public."

The same doctrine is announced in Morrison Bros. & Co. v. Coleman, 87 Ala. 655, 6 South. 374, 5 L. R. A. 384. In Little Rock, etc., R. R. v. Brooks, 43 Am. Rep. 277 (39 Ark. 403), the court, after discussing the question of what constitutes navigable capacity, says:

"The true criterion is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If in its natural state, without artificial im-

provements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then, in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort, and advance the prosperity of the community."

See Carter v. Thurston, 58 N. H. 104, 42 Am. Rep. 584.

In East Hoquiam Boom & Logging Co. v. Neeson et al., 20 Wash. 142, 54 Pac. 1001, the court holds it to be well settled that a stream which can only be made navigable or floatable by artificial means is not a public highway, citing a number of cases. In Kamm v. Normand, 50 Or. 9, 91 Pac. 448, 11 L. R. A. (N. S.) 290, 126 Am. St. Rep. 698, the court, after an extensive review of the authorities, holds that a stream to be navigable or floatable for sawlogs must be capable in its natural condition at ordinary recurring freshets of being successfully and profitably used for that purpose.

Under these authorities it seems clear that the Desplaines river, having been used as an interstate highway of commerce from 1673 to 1825 in the only kind of commerce then existing, is to be deemed of navigable capacity and a navigable stream within the Ordinance of 1787 and the acts of Congress of May 18, 1796 and March 26, 1804, by which Congress specifically took jurisdiction over navigable streams and declared that they should forever remain public highways. The river is a continuous stretch of water from Riverside to its mouth, and although there is a rapid, and in places shallow water, with boulders and obstructions, yet these things do not affect its navigable capacity. The same may be said of the upper part of the Illinois river above the head of steamboat navigation. We have no hesitation in deciding that both streams are navigable and are within the act of 1899.

[7] The only hesitation we have had in this case is on account of the decision of the Supreme Court of Illinois in People v. Economy Light & Power Co., 241 Ill. 290, 89 N. E. 760. The difference in the records in the two cases would not, perhaps, warrant a different conclusion, although the evidence here is somewhat stronger in favor of navigability than in that case. Taking, as we do, a different view as to the force and effect of the historical accounts of the early use of the river; and being clear that it is in fact a navigable stream, we feel that we should follow our own views.

Decree affirmed.