# UNITED STATES *v.* APPALACHIAN ELECTRIC POWER CO.

No. 12.   Argued October 14, 15, 1940.—Decided December 16, 1940.

*Solicitor General Biddle,* with whom *Messrs. John W. Aiken, Warner W. Gardner, Melvin H. Siegel, William S. Youngman, Jr., David W. Robinson, Jr., Gregory Hankin,* and *Willard W. Gatchell* were on the brief, for the United States.

380

382

384

*Mr. Raymond T. Jackson,* with whom *Messrs. A. Henry Mosle, Creswell M. Micou, Fraser M. Horn, Wendell W. Forbes, M. W. Belcher, Jr.,* and *John L. Abbot* were on the brief, for respondent.

388

By special leave of Court, *Mr. Abram P. Staples,* Attorney General, filed a brief and participated in the oral argument (see 309 U. S. 636) on behalf of the State of Virginia, as *amicus curiae.*

By leave of Court, briefs of *amici curiae* were filed on behalf of the States of Kentucky, by *Hubert Meredith,* Attorney General, and *M. B. Holifield,* Assistant Attorney General; West Virginia, by *Clarence W. Meadows,* Attorney General; Wisconsin, by *John E. Martin,* Attorney General, *Newell S. Boardman,* Assistant Attorney General, and *Mr. Adolph Kanneberg.*

A joint brief was filed: for Alabama, by *Thomas S. Lawson,* Attorney General; Arizona, by *Joe Conway,* Attorney General; California, by *Earl Warren,* Attorney General; Colorado, by *Byron G. Rogers,* Attorney General; Connecticut, by *Francis A. Pallotti,* Attorney General; Delaware, by *James R. Morford,* Attorney General; Florida, by *George Couper Gibbs,* Attorney General; Idaho, by *J. W. Taylor,* Attorney General; Illinois, by *John E. Cassidy,* Attorney General; Iowa, by *John M. Rankin,* Attorney General; Kansas, by *Jay S. Parker,* Attorney General; Kentucky, by *Hubert Meredith,* Attorney General, and *M. B. Holifield,* Assistant Attorney General; Louisiana, by *Eugene Stanley,* Attorney General; Maine, by *Franz E. Burkett,* Attorney General; Maryland, by *William C. Walsh,* Attorney General; Massachusetts, by *Paul A. Dever,* Attorney General; Michigan, by *Thomas Read,* Attorney General; Minnesota, by *J. A. A. Burnquist,* Attorney General; Mississippi, by *Greek L. Rice,* Attorney General; Missouri, by *Roy McKittrick,* Attorney General; Nebraska, by *Walter R. Johnson,* Attorney General; Nevada, by *Gray Mashburn,* Attorney General; New Hampshire, by *Thomas P. Cheney,* Attorney General; New Jersey, by *David T. Wilentz,* Attorney General; New Mexico, by *Filo M. Sedillo,* Attorney General; New York, by *John J. Bennett, Jr.,* Attorney General, and *Henry Epstein,* Solicitor General; North Carolina, by *Harry McMullan,* Attorney General; North Dakota,

by *Alvin C. Strutz*, Attorney General; Ohio, by *Thomas J. Herbert*, Attorney General; Oregon, by *I. H. Van Winkle*, Attorney General; Pennsylvania, by *Claude T. Reno*, Attorney General; Rhode Island, by *Louis V. Jackvony*, Attorney General; South Dakota, by *Leo A. Temmey*, Attorney General; Tennessee, by *Roy H. Beeler*, Attorney General; Utah, by *Joseph Chez*, Attorney General; Vermont, by *Lawrence C. Jones*, Attorney General; Virginia, by *Abram P. Staples*, Attorney General; Washington, by *Smith Troy*, Attorney General; and Wyoming, by *Ewing T. Kerr*, Attorney General— setting forth the position of the States in regard to the relative powers of the States and the United States over navigable and non-navigable waters.

MR. JUSTICE REED delivered the opinion of the Court.

This case involves the scope of the federal commerce power in relation to conditions in licenses, required by the Federal Power Commission, for the construction of hydroelectric dams in navigable rivers of the United States. To reach this issue requires, preliminarily, a decision as to the navigability of the New River, a watercourse flowing through Virginia and West Virginia. The district court and the circuit court of appeals have both held that the New River is not navigable, and that the United States cannot enjoin the respondent from constructing and putting into operation a hydroelectric dam situated in the river just above Radford, Virginia.

Sections 9 and 10 of the Rivers and Harbors Act of 1899 make it unlawful to construct a dam in any navigable water of the United States without the consent of Congress.[1] By the Federal Water Power Act of 1920,[2]

---

[1] 30 Stat. 1151, 33 U. S. C. §§ 401, 403.

[2] 41 Stat. 1063. The Act was amended by 49 Stat. 838 (1935), U. S. C. Supp. V, Title 16, § 791a *et seq.*, by which it became known as the Federal Power Act.

however, Congress created a Federal Power Commission with authority to license the construction of such dams upon specified conditions. Section 23 of that Act provided that persons intending to construct a dam in a nonnavigable stream may file a declaration of intention with the Commission. If after investigation the Commission finds that the interests of interstate or foreign commerce will not be affected, permission shall be granted for the construction. Otherwise construction cannot go forward without a license.

The Radford Dam project was initiated by respondent's predecessor, the New River Development Company, which filed its declaration of intention with the Federal Power Commission on June 25, 1925. The Commission requested a report from General Harry Taylor, then Chief of Engineers of the War Department. He first reported that the river was navigable, and also that while the water flow from the dam, if not properly regulated, could have an adverse effect on navigation during low water stages in the Kanawha River (of which the New was one of the principal tributaries), such possible adverse effect would not warrant refusing a license to construct the dam if control were maintained by the United States. On review at the Commission's request, however, General Taylor rendered a second report, concluding that the New River in its present condition was not navigable and that navigation on the Kanawha would not be adversely affected by the proposed power development. On March 2, 1926, the Commission held a hearing on the declaration; the only evidence then submitted was General Taylor's second report.

Respondent, the Appalachian Electric Power Company, took an assignment of the declaration of intention on August 30, 1926, and several days later filed an application for a license on the Commission's suggestion that this would expedite matters and could be withdrawn if it later developed that no federal license was required.

In October, the district engineer of the War Department held a public hearing at Radford. On June 1, 1927, the Commission made a finding that the New River was not "navigable waters" within the definition in § 3 of the Federal Water Power Act of 1920 but that (under § 23 of the Act) the project would affect the interests of interstate and foreign commerce. On July 1, 1927, the Commission tendered to respondent a standard form license, which the respondent refused, in April, 1928, principally on the ground that the conditions—especially those concerning rates, accounts and eventual acquisition—were unrelated to navigation. In February, 1930, respondent reiterated that its project was not within the Commission's jurisdiction, but nevertheless offered to accept a "minor-part" license [3] containing only such conditions as would protect the interests of the United States in navigation. In September, 1930, Attorney General Mitchell advised the Commission that it could properly issue such a minor-part license; [4] the question submitted by the Commission had stated that the New River was neither navigated nor navigable in fact. On November 25, the Commission "declined to take action on the application favorable or adverse," on the ground that a court adjudication was desirable. After the establishment of the Commission as an independent agency,[5] it held another hearing in February, 1931; in April it denied the application for a minor-part license, directed that the respondent be tendered a standard form license under the Act, and ordered it not to proceed without such a license. A minority of the Commission then

[3] § 10 (i).

[4] 36 Op. A. G. 355.

[5] Originally it consisted of three cabinet officers, ex officio: the Secretaries of War, Interior, and Agriculture. By 46 Stat. 797 it was reorganized into an independent Commission with five members. The new Commission began to function on December 22, 1930.

favored a finding that the New River was navigable; the majority, however, thought that question was for the courts and that the Commission's jurisdiction was properly based upon § 23 of the Federal Water Power Act.

On June 8, 1931, the respondent brought an action against the Commission to remove a cloud on its title and to restrain interference with the use of its property. This case was dismissed for jurisdictional reasons.[6] While it was pending, on October 12, 1932, the Commission without notice adopted a resolution that the New River, from the mouth of Wilson Creek, Virginia, north, was navigable.

The respondent began construction work on the dam about June 1, 1934. On May 6, 1935, the United States filed this bill for an injunction against the construction or maintenance of the proposed dam otherwise than under a license from the Federal Power Commission, and in the alternative a mandatory order of removal. It alleged that the New River is navigable; that the dam would constitute an obstruction to navigation and would impair the navigable capacity of the navigable waters of the United States on the New, Kanawha and Ohio Rivers; that the Commission had found the dam would affect the interests of interstate or foreign commerce; and that its construction therefore violated both the Rivers and Harbors Act and the Federal Water Power Act. Respondent denied these allegations, and also set forth a number of separate defenses based on the assumption that the New River was nonnavigable. The fortieth and forty-first paragraphs of the answer, however, set forth defenses relied on by the respondent even if the river were held navigable. The substance of these was (1) that the conditions of any federal license must

---

[6] *Appalachian Electric Power Co.* v. *Smith*, 67 F. 2d 451, cert. denied, 291 U. S. 674.

402

be strictly limited to the protection of the navigable capacity of the waters of the United States; and (2) that the Commission's refusal to grant the minor-part license containing only such conditions was unlawful, and that any relief should be conditioned upon the Commission's granting respondent such a license. By these defenses respondent put in question—in the event of an adverse holding on navigability—the validity of the conditions of the Act carried over into the standard form license which relate to accounts, control of operation and eventual acquisition of the project at the expiration of the license.

After trial, in an opinion reinforced by formal findings of fact and law, the district court decided that the New River is not a navigable water of the United States; that respondent's dam would not obstruct the navigable capacity of the Kanawha or any other navigable river, and would not affect the interests of interstate commerce; that the Power Commission's findings on these matters were not final but subject to the determination of the courts;[7] that the Federal Water Power Act did not vest in the Commission authority to require a license in a nonnavigable river; that even if the Commission had authority to require some license for a dam in nonnavigable waters, it could not impose conditions having no relation to the protection of the navigable capacity of waters of the United States; and that its effort to impose upon respondent a license containing unlawful conditions barred the United States from relief. The district judge therefore dismissed the bill, but left it open

---

[7] In both courts below the Government unsuccessfully urged that the findings of the Commission, if supported by substantial evidence, were conclusive. Although it still regards this contention as correct, the Government does not seek to have this Court pass on it in this case.

to the Government to assert its rights if future operation of the project interfered with the navigable capacity of the waters of the United States. The circuit court of appeals, with one judge dissenting, affirmed. We granted certiorari.[8]

*Concurrent Findings.* The district court's finding that the New River was not navigable was concurred in by the circuit court of appeals after a careful appraisal of the evidence in the record.[9] Both courts stated in detail the circumstantial facts relating to the use of the river and its physical characteristics, such as volume of water, swiftness and obstructions. There is no real disagreement between the parties here concerning these physical and historical evidentiary facts. But there are sharp divergencies of view as to their reliability as indicia of navigability and the weight which should be attributed to them. The disagreement is over the ultimate conclusion upon navigability to be drawn from this uncontroverted evidence.

The respondent relies upon this Court's statement that "each determination as to navigability must stand on its own facts,"[10] and upon the conventional rule that factual findings concurred in by two courts will be accepted by this Court unless clear error is shown.[11]

In cases involving the navigability of water courses, this Court, without expressly passing on the finality of the findings, on some occasions has entered into consideration of the facts found by two courts to determine for

---

[8] 309 U. S. 646.

[9] 107 F. 2d 769, 780, 787.

[10] *United States* v. *Utah,* 283 U. S. 64, 87.

[11] *Brewer Oil Co.* v. *United States,* 260 U. S. 77, 86; e. g., *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 477; *Pick Mfg. Co.* v. *General Motors Corp.,* 299 U. S. 3; *Texas & N. O. R. Co.* v. *Ry. Clerks,* 281 U. S. 548, 558; *United States* v. *O'Donnell,* 303 U. S. 501, 508.

itself whether the courts have correctly applied to the facts found the proper legal tests.[12]  When we deal with issues such as these before us, facts and their constitutional significance are too closely connected to make the two-court rule a serviceable guide.  The legal concept of navigability embraces both public and private interests.  It is not to be determined by a formula which fits every type of stream under all circumstances and at all times.  Our past decisions have taken due account of the changes and complexities in the circumstances of a river.  We do not purport now to lay down any single definitive test.  We draw from the prior decisions in this field and apply them, with due regard to the dynamic nature of the problem, to the particular circumstances presented by the New River.  To these circumstances certain judicial standards are to be applied for determining whether the complex of the conditions in respect to its capacity for use in interstate commerce render it a navigable stream within the Constitutional requirements.  Both the standards and the ultimate conclusion involve questions of law inseparable from the particular facts to which they are applied.

*Navigability.*  The power of the United States over its waters which are capable of use as interstate highways arises from the commerce clause of the Constitution.  "The Congress shall have Power . . .  To regulate Commerce . . . among the several States."  It was held early in our history that the power to regulate commerce necessarily included power over navigation.[13]  To make its control effective the Congress may keep the "navi-

---

[12] *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 699; *Leovy* v. *United States,* 177 U. S. 621; *Economy Light Co.* v. *United States,* 256 U. S. 113, 117; *United States* v. *Holt Bank,* 270 U. S. 49, 55.

[13] *Gibbons* v. *Ogden,* 9 Wheat. 1, 189; *Leovy* v. *United States,* 177 U. S. 621, 632.

gable waters of the United States" open and free and provide by sanctions against any interference with the country's water assets.[14]  It may legislate to forbid or license dams in the waters;[15] its power over improvements for navigation in rivers is "absolute."[16]

The states possess control of the waters within their borders, "subject to the acknowledged jurisdiction of the United States under the Constitution in regard to commerce and the navigation of the waters of rivers."[17]  It is this subordinate local control that, even as to navigable rivers, creates between the respective governments a contrariety of interests relating to the regulation and protection of waters through licenses, the operation of structures and the acquisition of projects at the end of the license term.  But there is no doubt that the United States possesses the power to control the erection of structures in navigable waters.

The navigability of the New River is, of course, a factual question[18] but to call it a fact cannot obscure the diverse elements that enter into the application of the legal tests as to navigability.  We are dealing here with the sovereign powers of the Union, the Nation's right that its waterways be utilized for the interests of the commerce of the whole country.  It is obvious that the uses to which the streams may be put vary from the carriage of ocean liners to the floating out of logs;[19] that the density of traffic varies equally widely from the busy

[14] *Gilman* v. *Philadelphia,* 3 Wall. 713, 724–25; *United States* v. *Coombs,* 12 Pet. 72, 78.

[15] *Willson* v. *Black Bird Creek Marsh Co.,* 2 Pet. 245, 250; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 703.

[16] *United States* v. *River Rouge Co.,* 269 U. S. 411, 419.

[17] *St. Anthony Falls Water Power Co.* v. *Water Commissioners,* 168 U. S. 349, 366; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 702.

[18] *Arizona* v. *California,* 283 U. S. 423, 452.

[19] *The Montello,* 20 Wall. 430, 441.

harbors of the seacoast to the sparsely settled regions of the Western mountains.[20] The tests as to navigability must take these variations into consideration.

Both lower courts based their investigation primarily upon the generally accepted definition of *The Daniel Ball*.[21] In so doing they were in accord with the rulings of this Court on the basic concept of navigability.[22] Each application of this test, however, is apt to uncover variations and refinements which require further elaboration.

In the lower courts and here, the Government urges that the phrase "susceptible of being used, in their ordinary condition," in the *Daniel Ball* definition, should not be construed as eliminating the possibility of determining navigability in the light of the effect of reasonable improvements. The district court thought the argument inapplicable.[23]

---

[20] *United States* v. *Utah*, 283 U. S. 64, 83.

[21] 10 Wall. 557, 563:

". . . Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

*United States* v. *Appalachian Electric Power Co.*, 23 F. Supp. 83, 98; same, 107 F. 2d 769, 780.

[22] *United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, 698; *Brewer Oil Co.* v. *United States*, 260 U. S. 77, 86; *United States* v. *Holt Bank*, 270 U. S. 49, 56; *United States* v. *Utah*, 283 U. S. 64, 76; *United States* v. *Oregon*, 295 U. S. 1, 15.

[23] 23 F. Supp. at 99–100.

The circuit court of appeals said:
"If this stretch of the river was not navigable in fact in its unimproved condition, it is not to be considered navigable merely because it might have been made navigable by improvements which were not in fact made. Of course if the improvements had been made the question of fact might have been different." [24]

To appraise the evidence of navigability on the natural condition only of the waterway is erroneous. Its availability for navigation must also be considered. "Natural and ordinary condition" [25] refers to volume of water, the gradients and the regularity of the flow. A waterway, otherwise suitable for navigation, is not barred from that classification merely because artificial aids must make the highway suitable for use before commercial navigation may be undertaken. Congress has recognized this in § 3 of the Water Power Act by defining "navigable waters" as those "which either in their natural or improved condition" are used or suitable for use. The district court is quite right in saying there are obvious limits to such improvements as affecting navigability. These limits are necessarily a matter of degree.[26] There must be a balance between cost and need at a time when

[24] 107 F. 2d at 786.

[25] *United States* v. *Oregon,* 295 U. S. 1, 15.

[26] Thus in the *Rio Grande* case, the record contained reports of army engineers that improvements necessary to make the river navigable would be financially, if not physically, impracticable because of the many millions of dollars that would be required. The supreme court of the Territory of New Mexico observed that "the navigability of a river does not depend upon its susceptibility of being so improved by high engineering skill and the expenditure of vast sums of money, but upon its natural present conditions" (9 N. M. 292, 299; 51 P. 674, 676). This Court agreed that too much improvement was necessary for the New Mexico stretch of the river to be considered navigable. *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 699.

the improvement would be useful. When once found to be navigable, a waterway remains so.[27] This is no more indefinite than a rule of navigability in fact as adopted below based upon "useful interstate commerce" or "general and common usefulness for purposes of trade and commerce" if these are interpreted as barring improvements.[28] Nor is it necessary that the improvements should be actually completed or even authorized. The power of Congress over commerce is not to be hampered because of the necessity for reasonable improvements to make an interstate waterway available for traffic.

Of course there are difficulties in applying these views. Improvements that may be entirely reasonable in a thickly populated, highly developed, industrial region may have been entirely too costly for the same region in the days of the pioneers. The changes in engineering practices or the coming of new industries with varying classes of freight may affect the type of the improvement. Although navigability to fix ownership of the river bed [29] or riparian rights [30] is determined as the cases just cited in the notes show, as of the formation of the Union in the original states or the admission to statehood of those formed later, navigability, for the purpose of the regulation of commerce, may later arise.[31] An analogy is found in admiralty jurisdiction,[32] which may be extended over places formerly nonnavigable.[33] There

[27] *Economy Light Co.* v. *United States*, 256 U. S. 113.

[28] See 107 F. 2d at 780.

[29] *Shively* v. *Bowlby*, 152 U. S. 1, 18 and 26; *United States* v. *Utah*, 283 U. S. 64, 75.

[30] *Oklahoma* v. *Texas*, 258 U. S. 574, 591, 594; *United States* v. *Oregon*, 295 U. S. 1, 14.

[31] Cf. *United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, 699.

[32] Art. III, § 2, cl. 1. Cf. *Genesee Chief* v. *Fitzhugh*, 12 How. 443.

[33] *The Robert W. Parsons*, 191 U. S. 17, 28; *Ex parte Boyer*, 109 U. S. 629; *Marine Transit Co.* v. *Dreyfus*, 284 U. S. 263, 271–72.

has never been doubt that the navigability referred to in the cases was navigability despite the obstruction of falls, rapids, sand bars, carries or shifting currents.[34] The plenary federal power over commerce must be able to develop with the needs of that commerce which is the reason for its existence. It cannot properly be said that the federal power over navigation is enlarged by the improvements to the waterways. It is merely that improvements make applicable to certain waterways the existing power over commerce.[35] In determining the navigable character of the New River it is proper to consider the feasibility of interstate use after reasonable improvements which might be made.[36]

Nor is it necessary for navigability that the use should be continuous. The character of the region, its products and the difficulties or dangers of the navigation influence the regularity and extent of the use.[37] Small traffic compared to the available commerce of the region is sufficient.[38] Even absence of use over long periods of years, because of changed conditions, the coming of the railroad or improved highways does not affect the navigability

---

[34] *The Montello,* 20 Wall. 430, 442–43; *Economy Light Co.* v. *United States,* 256 U. S. 113, 122; *United States* v. *Utah,* 283 U. S. 64, 86. See also Mr. Justice McLean in *Spooner* v. *McConnell,* 22 Fed. Cas. No. 13,245, at p. 944 (C. C. D. Ohio 1838).

[35] Illustrative of this natural growth is *United States* v. *Cress,* 243 U. S. 316, involving riparian proprietors' rights where improvements raise the river level so that uplands are newly and permanently subjected to the servitude of public use for navigation. Compensation was decreed for the taking with a declaration that the waterways in question, as artificially improved, remained navigable waters of the United States (pp. 325 and 326). Cf. *Arizona* v. *California,* 283 U. S. 423, 454.

[36] Cf. *Barnes* v. *United States,* 46 Ct. Cl. 7, 28.

[37] *United States* v. *Utah,* 283 U. S. 64; *Arizona* v. *California,* 283 U. S. 423, 452–54.

[38] *United States* v. *Utah,* 283 U. S. 64, 82.

of rivers in the constitutional sense.[39] It is well recognized too that the navigability may be of a substantial part only of the waterway in question.[40] Of course, these evidences of nonnavigability in whole or in part are to be appraised in totality to determine the effect of all. With these legal tests in mind we proceed to examine the facts to see whether the 111-mile reach of this river from Allisonia to Hinton, across the Virginia-West Virginia state line, has "capability of use by the public for the purposes of transportation and commerce."[41]

*Physical Characteristics.* New River may be said to assume its character as such at the mouth of Wilson Creek near the North Carolina-Virginia line. From that point it flows first in a northeast and then in a northwest direction something over 250 miles to Kanawha Falls, West Virginia. It passes through Allisonia and Radford, Virginia, and then Hinton, West Virginia. It is joined by many tributaries, the largest of which is the Gauley. At Kanawha Falls it changes its name to the Kanawha, a navigable river of commercial importance which joins the Ohio 97 miles below. The whole territory traversed by the New is broken and mountainous. Between Hinton and Kanawha Falls, the river is swift and the gorge precipitous. Above Hinton the river flows more slowly, through a broader valley and between less rugged mountains. The same may be said of the area above Radford. Throughout the river there is an abundance of water, and the respondent hardly denies that the flowage suffices if other conditions make the New available for navigation.[42]

[39] *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 329.

[40] *Economy Light Co.* v. *United States,* 256 U. S. 113, 124; *Arizona* v. *California,* 283 U. S. 423, 453.

[41] Cf. *The Montello,* 20 Wall. 430, 441.

[42] See 23 F. Supp. at 91.

It will conserve discussion to appraise the navigability of the 111-mile stretch between Allisonia and Hinton in three sections which together form the whole reach between these points: the 28 miles from Allisonia to Radford, which the United States improved between 1876 and 1883; the 59-mile stretch from Radford to Wiley's Falls, Virginia, never improved except at Wiley's Falls itself; and the 24 miles from Wiley's Falls across the state line to Hinton, West Virginia, which, like the upper section, the Government improved during 1876–1883. We shall examine chiefly the disputed middle section, for as to the others the evidence of navigability is much stronger and that of obstructions much weaker. For instance, the report of the Chief of Engineers for 1873 refers to certain keelboats operating on the river, and his report for 1883 shows that 17 keelboats operated above Hinton. Keelboats were flat-bottomed bateaux, 50 to 70 feet long, with a draft of two feet and a carrying capacity varying up to 10 or 12 tons. They were used commercially to transport lumber, tobacco and other products of the region. The evidence is clear that these bateaux plied from Hinton up to near Glen Lyn with fair regularity through the first decade of this century and well into the second; timber and lumber in large quantities apparently were boated and rafted down to Hinton from various up-river points below Glen Lyn until about the beginning of the World War.[43] Around and above Radford the Chief of Engineers reported two keelboats operating in 1881, eight in 1882, and eight together with a small steamboat in 1883. The corroborating testimony of many witnesses shows that in the 80s

[43] This is shown by the testimony of W...s, Peters, Starbuck, Lane, E. M. Smith, Farley, Kenley, Lucas, E. W. Lilly, W. L. Burks, Z. V. Burks, Johnson, Wauhop, Stover, R. Calloway, J. C. Martin, Tomkies, and B. C. Lilly.

these boats carried iron ore and pig iron, as well as produce and merchandise, between Allisonia and New River Bridge, which is a little above Radford.[44]  At the Hinton and New River Bridge railroad stations, freight brought in by the keelboats or other river craft was trans-shipped, and freight arriving by rail was forwarded by river.

We come then to a consideration of the crucial stretch from Radford to below Wiley's Falls where junction is made with the interstate reach from Wiley's Falls to Hinton. In the report of the Secretary of War for 1872 appears Hutton's useful mile-by-mile survey of the river from above Allisonia to the mouth of the Greenbrier, which is nearly down to Hinton. It was made as a basis for plans to improve the New by federal appropriation.[45] This survey designates the Radford-Wiley's Falls stretch as "mile 46" to "mile 104" inclusive. Eighteen of these miles have grades falling, gradually or abruptly, more than four feet in the mile. Several of these where there are rapids or falls show drops of eight, nine and in one instance $11\frac{1}{2}$ feet. The higher footage represents, of course, miles in which small falls are found. Between these more precipitous sections are many miles of what is called "good water," with a gradual fall of 4 feet or less. Even in miles where the declivity is rapid, the fall is apparently largely in sections containing obstructions.

[44] E. g., the testimony of R. L. Howard, Graham, J. Breeding, Owen, Z. Farmer, H. B. Allison, J. H. Howard, Peterson, Moore, Likens, Roop, and Ingles.

In 1885 the assistant engineer reported that "from inquiries it is thought that the channel-way made in former years [on the improved sections] still keeps open, and bateaux are in constant use on them, iron having been shipped to New River bridge up to the time of the suspension of the furnaces by the prevailing hard times" (Report of the Chief of Engineers for 1886).

[45] 17 Stat. 376.

For instance, the 51st mile reads "Rapid, over bowlders and gravel, 1,500 feet long; fall, 8½ feet," and the 100th mile "Neilley's Falls and rapids; whole fall, 11 feet, 6 of it nearly vertical. A sluice 500 feet long, along left bank, will pass them, with 50 feet of rock excavation and 450 feet of bowlders and gravel." Quite frequently where the fall is moderate, other obstructions appear, as the 78th mile "Rapids, 500 feet long, over bowlders and gravel; fall, 2 feet." Large isolated rocks are scattered abundantly throughout the stretch. A geologist testifying for the respondent tells strikingly how the faulting and folding of the surface at this stretch has resulted in the tilting of the rock strata to a steep degree. "In its flow, the water of New River moves along and up the slopes of successive rock strata or ledges . . . this results in a river with numerous ledges of rock strata, some partly submerged, some exposed, which are substantially vertical or standing on end, and which extend across the stream at right angles to the line of flow . . . The slope of the strata is downward in an upstream direction rather than in a downstream direction," contrary to the usual condition. No other data point to material variations from these descriptions.

*Use of the River from Radford to Wiley's Falls.* Navigation on the Radford-Wiley's Falls stretch was not large. Undoubtedly the difficulties restricted it and with the coming of the Norfolk & Western and the Chesapeake & Ohio railroads in the 80s, such use as there had been practically ceased, except for small public ferries going from one bank to the other.[46] Well authenticated instances of boating along this stretch, however, exist. In 1819 a survey was made by Moore and Briggs, whom the

---

[46] At different times before 1935 ferries crossed the river at no less than ten points along the Radford-Wiley's Falls stretch. In 1935 there were five such public ferries.

General Assembly of Virginia had sent to report on the availability of the New for improvement. Beginning at the mouth of the Greenbrier they boated up to the mouth of Sinking Creek, some 55 miles, noting the characteristics of the river as they went. They reported that they ascended all falls with their boat, "though, in two or three instances, with considerable difficulty, after taking out our baggage, stores, &c." [47] Sinking Creek is about half way up this stretch of river we are considering.

In 1861 the Virginia General Assembly appropriated $30,000 to improve the New River to accommodate transportation of military stores by bateaux from Central depot [Radford] to the mouth of the Greenbrier.[48] While there is no direct proof that this particular appropriation was spent, reports of the War Department engineers make it clear that the Confederate government effected some improvements on the river.[49] These facts buttress the testimony of several witnesses, one a Confederate veteran, that during the Civil War keelbottom boats brought supplies from Radford to a commissary at

[47] Report of Moore and Briggs. Fourth and Fifth Annual Reports of the Board of Public Works to the General Assembly of Virginia (1819). Report of the Principal Engineer of the Board of Public Works.

While Marshall was Chief Justice he was head of a Virginia commission which had surveyed part of the New River by boat in 1812, but only going downstream from the mouth of the Greenbrier. Report of the Commissioners, printed 1816.

[48] 48 Virginia Acts of 1861-62, c. 50.

[49] "But little has been done in the way of improving the river since the time of Moore and Briggs, though an effort is said to have been made in that direction by the confederate government in the late war" (Report of Chief of Engineers for 1873). "Experience, as developed by the universal fate of the work of the late Confederate States on this river (though this seems to have been injudiciously located and poorly built), is adverse to anything like rigid structures . . ." (Report of Chief of Engineers for 1879).

the Narrows (about 7 miles above Glen Lyn), and then continued further downstream.[50] This testimony the circuit court of appeals accepted as true.[51]

From the end of the Civil War to the coming of the railroads, the evidence of elderly residents familiar with events along the banks of the river between Radford and Wiley's Falls leaves no doubt that at least sporadic transportation took place in and throughout this stretch. By this it is not meant that the keelboats above Radford and above Hinton, which operated frequently in the improved sections, made regular through trips from Allisonia past Radford to Hinton. Through navigation, however, did occur, as is shown by the testimony of a number of witnesses and recognized by the lower courts.[52] There are also numerous references to isolated bits of boating along parts of the Radford-Wiley's Falls reach.[53] And when the Government stopped improvement in 1883, it ordered the boats it was using in the lead mines' division above Allisonia, and at various places downstream, to be brought down the full stretch of the river to Hinton for sale. Under the supervision of the assistant engineer, a derrick boat, four bateaux, and numerous flat boats, skiffs and canoes—more than twenty vessels in all—were taken down to Hinton, a number of them from points above Radford. This was accomplished, as the Chief of Engineers' report shows, despite difficulties

---

[50] Testimony of Snyder, Snidow, Skeen.

[51] 107 F. 2d at 783.

[52] See 23 F. Supp. at 93; 107 F. 2d at 786.

Testimony of bateaux going from Radford, or above, to Hinton, is given by Flannagan, Linkous, Collins, Webb, Snyder.

A boat, 50 feet by 8, with a gasoline motor, went from Radford to Hinton in 1901, though after the river had been materially raised by a rain.

[53] E. g., testimony of Coleman, Howard, Webb, Snyder, Price, Martin, Anderson.

occasioned by "weather, low water, and scarcity of labor." [54]

In addition to the testimony of use in the days before railways and good roads, there was a demonstration of the possibility of navigation by a government survey boat with an outboard motor, 16 feet long, five feet wide, drawing 2½ to 3 feet, loaded with a crew of five and its survey equipment. This boat made a round trip from the Narrows, just above Wiley's Falls, to Allisonia, a distance of 72 miles one way, in July, 1936, when the river stage was normal summer low water. While the crew was out of the boat and used poles a number of times, there were no carries or portages. Going upstream it was not necessary to pull or push the boat more than a mile and a quarter and not more than a few hundred feet on the return trip.

Use of a stream long abandoned by water commerce is difficult to prove by abundant evidence. Fourteen authenticated instances of use in a century and a half by explorers and trappers, coupled with general historical references to the river as a water route for the early fur traders and their supplies in pirogues and Durham or flat-bottomed craft similar to the keelboats of the New, sufficed upon that phase in the case of the DesPlaines. [55] Nor is lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation. [56]

The evidence of actual use of the Radford-Wiley's Falls section for commerce and for private convenience,

---

[54] Report of the Chief of Engineers for 1883. See also testimony of Owen, Crowell, Dickinson.

[55] *Economy Light Co.* v. *United States,* 256 F. 792, 797–98; affirmed 256 U. S. 113.

[56] *United States* v. *Utah,* 283 U. S. 64, 82.

when taken in connection with its physical condition, makes it quite plain that by reasonable improvement the reach would be navigable for the type of boats employed on the less obstructed sections. Indeed the evidence detailed above is strikingly similar to that relied upon by this Court in *United States* v. *Utah* [57] to establish the navigability of the Colorado from Cataract Canyon to the Utah-Arizona boundary line. There had been seventeen through trips over a period of sixty years from the original exploration; and these together with sporadic trips on parts of the stretch, and considerable use—in connection with gold placer mining—of other parts from 1888 to 1915, sufficed to sustain navigability. [58]

*Effect of Improvability.* Respondent denied the practicability of artificial means to bring about the navigability of the New River and the effectiveness of any improvement to make the river a navigable water of the United States. The Government supported its allegation of improvability by pointing out that the use of the section for through navigation and local boating on favorable stretches of the Radford-Wiley's Falls reach showed the feasibility of such use and that little was needed in the way of improvements to make the section a thoroughfare for the typical, light commercial traffic of the area. Keelboats, eight feet wide, drawing two feet, were the usual equipment. In the 1872 report of the Chief of Engineers, Major Craighill in charge of New River reports that to get "good sluice navigation of 2 feet at all times" for 54 miles up from the mouth of the Greenbrier River, near Hinton, would cost $30,000 and for 128 miles, Greenbrier to the lead mines (above Allisonia), would cost $100,000. The depth over the shoals could be increased to 2 feet without "too much increase

[57] 283 U. S. 64, 81.
[58] See the Report of the Master, p. 127 *et seq.*

of velocity of the current." This recommendation was based on Hutton's mile-by-mile survey and includes all of the Radford-Wiley's Falls section.

., The improvements were undertaken beginning in 1877. As the region was becoming better developed, a higher type of improvement became desirable, wider sluice ways and a deeper channel, usable by small steamboats. Work went forward above Hinton and above Radford to meet the pressing demands of the communities. Annual reports of the Chief of Engineers assumed or reaffirmed the navigability of the entire river above Hinton and the practicality of the improvements.[59] By 1891, $109,-733.21 had been spent. It was in that year estimated $159,000 more would be required to complete the project the full length from Wilson Creek to Hinton.[60] Useful navigation moved regularly between Hinton and near Glen Lyn and between Radford and Allisonia. About half the reach between Hinton and Allisonia was improved. The Radford-Wiley's Falls section was never improved. It was reported that conditions had changed and the project should not be completed.[61] The provisions for improvements were repealed in 1902.[62] By 1912 the region's need for use of the river had so diminished that the army engineers advised against undertaking improvements again, and even referred to the cost as "prohibitive." [63] From the use of the Radford-Wiley's Falls stretch and the evidence as to its ready improvability at a low cost for easier keelboat use, we conclude that this section of the New River is navigable. It follows from this, together with the undisputed commercial

---

[59] Report for 1878, pp. 69, 495–99; 1879, pp. 79, 530–45; 1880, pp. 107–08, 676–81; 1881, pp. 144–45, 904–11; 1882, pp. 140–42, 913–19; 1883, pp. 144–45, 699–705; 1886, pp. 281–82, 1599–1602.

[60] Report of the Chief of Engineers for 1891, p. 303.

[61] Id., at 302–303.

[62] 32 Stat. 374.

[63] House Doc. No. 1410, 62nd Cong., 3d Sess., p. 3.

use of the two stretches above Radford and Hinton, that the New River from Allisonia, Virginia, to Hinton, West Virginia, is a navigable water of the United'States.

*License Provisions.* The determination that the New River is navigable eliminates from this case issues which may arise only where the river involved is nonnavigable.[64] But even accepting the navigability of the New River, the respondent urges that certain provisions of the license, which seek to control affairs of the licensee, are unconnected with navigation and are beyond the power of the Commission, indeed beyond the constitutional power of Congress to authorize.

The issue arises because of the prayer of the bill that the respondent be compelled to accept the license as required by law or remove the dam as an obstruction and the answer of the respondent that the license required by law and tendered to it by the Commission contains provisions, unrelated to navigation or the protection of navigable capacity, which are beyond the constitutional authority of Congress to require on account of the Fifth and Tenth Amendments. There is no contention that the provisions of the license are not authorized by the statute. In the note below[65] the chief

---

[64] Cf. *United States* v. *Appalachian Electric Power Co.*, 107 F. 2d 769, 793 *et seq.*

[65] Section 4 (a) of the Act allows the Commission to regulate the licensee's accounts.

Section 6 limits licenses to 50 years.

Section 8 requires Commission approval for voluntary transfers of licenses or rights granted thereunder.

Section 10 (a), as amended in 1935, requires that the project be best adapted to a comprehensive plan for improving or developing the waterway for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes. Under § 10 (c) the licensee must maintain the project adequately for navigation and for efficient power operation, must maintain depreciation reserves adequate for renewals and replacements, and must

statutory conditions for a license are epitomized. The license offered the respondent on May 5, 1931, embodied these statutory requirements and we assume it to be in conformity with the existing administration of the Power Act. We shall pass upon the validity of only those provisions of the license called to our attention by the respondent as being unrelated to the purposes of navigation. These are the conditions derived from §§ 10a, 10c, 10d, 10e and 14. We do not consider that the validity of other clauses has been raised by the respondent's general challenge to the constitutionality of any provision "other than those relating solely to the protection" of navigable waters.[66] It should also be noted that no complaint is made of any conditions of the license dependent upon the authorization of § 10g, the omnibus

---

conform to the Commission's regulations for the protection of life, health and property; (d) out of surplus earned after the first 20 years above a specified reasonable rate of return, the licensee must maintain amortization reserves to be applied in reduction of net investment; (e) the licensee must pay the United States reasonable annual charges for administering the Act, and during the first 20 years the United States is to expropriate excessive profits until the state prevents such profits; (f) the licensee may be ordered to reimburse those by whose construction work it is benefited.

By § 11, for projects in navigable waters of the United States the Commission may require the licensee to construct locks, etc., and to furnish the United States free of cost (a) lands and rights-of-way to improve navigation facilities, and (b) power for operating such facilities.

Section 14 gives the United States the right, upon expiration of a license, to take over and operate the project by paying the licensee's "net investment" as defined, not to exceed fair value of the property taken. However, the right of the United States or any state or municipality to condemn the project at any time is expressly reserved.

Section 19 allows state regulation of service and rates: if none exists, the Commission may exercise such jurisdiction.

[66] *Denver Stock Yard Co.* v. *United States,* 304 U. S. 470, 484; *Pacific States Co.* v. *White,* 296 U. S. 176, 184.

clause requiring compliance with such other conditions as the Commission may require.

The petitioner suggests that consideration of the validity of § 14, the acquisition clause, and the license conditions based upon its language are properly to be deferred until the United States undertakes to claim the right to purchase the project on the license terms fifty years after its issuance.[67] Assuming that the mere acceptance of a license would not later bar the objection of unconstitutional conditions, even when accompanied by a specific agreement to abide by the statute and license,[68] we conclude that here the requirements of § 14 so vitally affect the establishment and financing of respondent's project as to require a determination of their validity before finally adjudging the issue of injunction.

The respondent's objections to the statutory and license provisions, as applied to navigable streams, are based on the contentions (1) that the United States' control of the waters is limited to control for purposes of navigation, (2) that certain license provisions take its property without due process, and (3) that the claimed right to acquire this project and to regulate its financing, records and affairs, is an invasion of the rights of the states, contrary to the Tenth Amendment.

Forty-one states join as *amici* in support of the respondent's arguments. While conceding, as of course, that Congress may prohibit the erection in navigable waters of the United States of any structure deemed to impair navigation, the Attorneys General speaking for the states insist that this power of prohibition does not comprehend a power to exact conditions, which are un-

---

[67] Cf. *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n,* 303 U. S. 419, 435; *W. W. Cargill Co.* v. *Minnesota,* 180 U. S. 452, 468; *New Jersey* v. *Sargent,* 269 U. S. 328, 339.

[68] § 6.

related to navigation, for the permission to erect such structures. To permit, the argument continues, the imposition of licenses involving conditions such as this acquisition clause, enabling the Federal Government to take over a natural resource such as water-power, allows logically similar acquisition of mines, oil or farmlands as consideration for the privilege of doing an interstate business. The states thus lose control of their resources and property is withdrawn from taxation in violation of the Tenth Amendment.

Further, the point is made that a clash of sovereignty arises between the license provisions of the Power Act and state licensing provisions. The Commonwealth of Virginia advances forcibly its contention that the affirmative regulation of water-power projects on its navigable streams within its boundaries rests with the state, beyond that needed for navigation. "While the supremacy of the Federal Government in its own proper sphere, as delineated in the Constitution, is cheerfully conceded, yet just as earnestly does Virginia insist upon the supremacy of her own government in its proper field as established by that instrument." Virginia has a Water Power Act.[69] It, too, offers a fifty-year license, with the right to use the natural resources of the state, the stream flow and the beds of the water courses for the period of the license or its extensions subject to state condemnation at any time on Virginia's terms for ascertainment of value. Operation is likewise regulated by state law.[70] The Commonwealth objects that the development of its water power resources is subjected to Federal Power Act requirements such as are detailed above in stating the respondent's objection, even to the point that Virginia itself may not build and operate a dam in

[69] Michie's 1936 Code, §§ 3581 (1)-(16).
[70] Michie's 1936 Code, §§ 4065a, 4066.

navigable water without authorization and regulation by the Federal Government.

The briefs and arguments at the bar have marshaled reasons and precedents to cover the wide range of possible disagreement between Nation and State in the functioning of the Federal Power Act. To predetermine, even in the limited field of water power, the rights of different sovereignties, pregnant with future controversies, is beyond the judicial function. The courts deal with concrete legal issues, presented in actual cases, not abstractions.[71] The possibility of other uses of the coercive power of license, if it is here upheld, is not before us. We deem the pictured extremes irrelevant save as possibilities for consideration in determining the present question of the validity of the challenged license provisions. To this we limit this portion of our decision.[72]

The respondent is a riparian owner with a valid state license to use the natural resources of the state for its enterprise. Consequently it has as complete a right to the use of the riparian lands, the water, and the river bed as can be obtained under state law. The state and respondent, alike, however, hold the waters and the lands under them subject to the power of Congress to control the waters for the purpose of commerce.[73] The power flows from the grant to regulate, i. e., to "prescribe the rule by which commerce is to be governed."[74] This in-

[71] *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 75; *United States* v. *West Virginia*, 295 U. S. 463, 474; *New Jersey* v. *Sargent*, 269 U. S. 328; cf. *McGuinn* v. *High Point*, 217 N. C. 449, 458; 8 S. E. 2d 462.

[72] *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 339.

[73] *New Jersey* v. *Sargent*, 269 U. S. 328, 337; *United States* v. *River Rouge Co.*, 269 U. S. 411, 419; *United States* v. *Cress*, 243 U. S. 316, 320; *Willink* v. *United States*, 240 U. S. 572, 580; *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 62; *Gibson* v. *United States*, 166 U. S. 269, 271.

[74] *Gibbons* v. *Ogden*, 9 Wheat. 1, 196.

cludes the protection of navigable waters in capacity as well as use.[75] This power of Congress to regulate commerce is so unfettered that its judgment as to whether a structure is or is not a hindrance is conclusive. Its determination is legislative in character.[76] The Federal Government has domination over the water power inherent in the flowing stream. It is liable to no one for its use or non-use. The flow of a navigable stream is in no sense private property; "that the running water in a great navigable stream is capable of private ownership is inconceivable." Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion.[77]

Possessing this plenary power to exclude structures from navigable waters and dominion over flowage and its product, energy, the United States may make the erection or maintenance of a structure in a navigable water dependent upon a license.[78] This power is exercised through § 9 of the Rivers and Harbors Act of 1899 prohibiting construction without Congressional consent and through § 4 (e) of the present Power Act.

It is quite true that the criticized provisions summarized above are not essential to or even concerned with navigation as such. Respondent asserts that the rights of the United States to the use of the waters is limited to navigation. It is pointed out that the federal sovereignty over waters was so described in *Port of Seattle* v. *Oregon & Washington R. Co.*[79] *United States* v. *Ore-*

---

[75] *Gilman* v. *Philadelphia*, 3 Wall. 713, 725.

[76] *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 64, 65; *Union Bridge Co.* v. *United States*, 204 U. S. 364, 400; cf. *Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518, 18 How. 421.

[77] *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 66, 69, 76; cf. *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 330.

[78] *Greenleaf Lumber Co.* v. *Garrison*, 237 U. S. 251, 268; *United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, 707.

[79] 255 U. S. 56, 63.

gon,[80] *Kansas* v. *Colorado*,[81] *United States* v. *River Rouge Company*,[82] and *Wisconsin* v. *Illinois*.[83] The first two of these cases centered around the issue of title to land under navigable water. Nothing further was involved as to the use of the water than its navigability. In *Kansas* v. *Colorado* the point was the Government's advocacy of the doctrine of sovereign and inherent power to justify the United States taking charge of the waters of the Arkansas to control the reclamation of arid lands (pp. 85–89). There was found no constitutional authority for irrigation in the commerce clause or the clause relating to property of the United States.[84] It cannot be said, however, that the case is authority for limiting federal power over navigable waters to navigation;[85] especially since the stretch of the Arkansas River involved in the dispute was asserted by the Government to be nonnavigable (p. 86). In the *River Rouge* controversy, this Court spoke of the limitation "to the control thereof for the purposes of navigation." But there, too, it was a question of the riparian owner's use of his property for access to the channel, a use fixed by state law. The conclusion that the United States could not interfere, except for navigation, with his right of access to navigable water, required no appraisal of other rights. *Wisconsin* v. *Illinois* is a part of the Chicago Drainage Canal litigation. In so far as pertinent here, it merely decided that under a certain federal statute [86] there was no authority for diversion of the waters of Lake Michigan for sanitary purposes (p. 418). There is no consideration

[80] 295 U. S. 1, 14.
[81] 206 U. S. 46, 85–86.
[82] 269 U. S. 411, 419.
[83] 278 U. S. 367, 415.
[84] Art. IV, § 3, cl. 2.
[85] Cf. *United States* v. *Hanson*, 167 F. 881, 884; *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 322.
[86] Cf. *Sanitary District* v. *United States*, 266 U. S. 405, 428.

of the constitutional power to use water for other than navigable purposes, though it is plain that other advantages occur (pp. 415, 419).

In our view, it cannot properly be said that the constitutional power of the United States over its waters is limited to control for navigation. By navigation respondent means no more than operation of boats and improvement of the waterway itself. In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control.[37] As respondent soundly argues, the United States cannot by calling a project of its own "a multiple purpose dam" give to itself additional powers, but equally truly the respondent cannot, by seeking to use a navigable waterway for power generation alone, avoid the authority of the Government over the stream. That authority is as broad as the needs of commerce. Water power development from dams in navigable streams is from the public's standpoint a by-product of the general use of the rivers for commerce. To this general power, the respondent must submit its single purpose of electrical production. The fact that the Commission is willing to give a license for a power dam only is of no significance in appraising the type of conditions allowable. It may well be that this portion of the river is not needed for navigation at this time. Or that the dam proposed may function satisfactorily with others, contemplated or intended. It may fit in as a part of the river development. The point is that navigable waters are subject to national planning and control in the broad regulation of commerce granted the

---

[37] Cf. *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288.

Federal Government. The license conditions to which objection is made have an obvious relationship to the exercise of the commerce power. Even if there were no such relationship the plenary power of Congress over navigable waters would empower it to deny the privilege of constructing an obstruction in those waters. It may likewise grant the privilege on terms. It is no objection to the terms and to the exertion of the power that "its exercise is attended by the same incidents which attend the exercise of the police power of the states." [88] The Congressional authority under the commerce clause is complete unless limited by the Fifth Amendment.

The respondent urges that as riparian owner with state approval of its plans, it is entitled to freedom in the development of its property and particularly cannot be compelled to submit to the acquisition clause with a price fixed at less than a fair value, in the eminent domain sense, at the time of taking. Such a taking, it is contended, would violate the Fifth Amendment. It is now a question whether the Government in taking over the property may do so at less than a fair value. It has been shown, note 77, *supra*, that there is no private property in the flow of the stream. This has no assessable value to the riparian owner. If the Government were now to build the dam, it would have to pay the fair value, judicially determined,[89] for the fast land; nothing for the water power.[90] We assume without deciding that by compulsion of the method of acquisition provided in § 14 of the Power Act and the tendered license, these riparian rights may pass to the United States for less than their value. In our view this "is the price which [respondents] must pay to secure the right to maintain

[88] *United States* v. *Carolene Products Co.*, 304 U. S. 144, 147. Cf. *Mulford* v. *Smith*, 307 U. S. 38, 48.

[89] *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 327.

[90] *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 66, 76.

their dam." The quoted words are the conclusion of the opinion in *Fox River Co.* v. *Railroad Commission.*[91] The case is decisive on the issue of confiscation. It relates to an acquisition clause in a Wisconsin license by which a dam in navigable water of the state might be taken over at such a price as would, this Court assumed, amount to violation of the due process clause of the Fourteenth Amendment if it were not for the license provision. Title to the bank and bed were in the objector, just as, by virtue of the state's license and the riparian ownership, all rights here belong to respondent. There, as here, the rights were subject to governmental "control of navigable waters."[92] The fact that the *Fox River* case involved a state and that this case involves the United States is immaterial from the due process standpoint. Since the United States might erect a structure in these waters itself, even one equipped for electrical generation,[93] it may constitutionally acquire one already built.

Such an acquisition or such an option to acquire is not an invasion of the sovereignty of a state. At the formation of the Union, the states delegated to the Federal Government authority to regulate commerce among the states. So long as the things done within the states by the United States are valid under that power, there can be no interference with the sovereignty of the state. It is the non-delegated power which under the Tenth Amendment remains in the state or the people. The water power statutes of the United States and of Virginia recognize the difficulties of our dual system of

[91] 274 U. S. 651.

[92] *Id.*, 656.

[93] *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288; *Arizona* v. *California,* 283 U. S. 423.

government by providing, each in its own enactments, for the exercise of rights of the other.[94]

Reversed and remanded to the District Court with instructions to enter an order enjoining the construction, maintenance or operation of the Radford project otherwise than under a license, accepted by the respondent within a reasonable time, substantially in the form tendered respondent by the Federal Power Commission on or about May 5, 1931, or in the alternative, as prayed in the bill.

*Reversed.*

The CHIEF JUSTICE took no part in the consideration or decision of this case.

MR. JUSTICE ROBERTS, dissenting:

The judgment of reversal rests on the conclusion that New River is navigable,—a conclusion resting on findings of fact, made here *de novo,* and in contradiction of the concurrent findings of the two courts below. I am of opinion that the judgment of the Circuit Court of Appeals should be affirmed, first, because this court ought to respect and give effect to such concurrent findings which have substantial support in the evidence; secondly, because the evidence will not support contrary findings if the navigability of New River be tested by criteria long established.

1. A river is navigable in law if it is navigable in fact.[1] Indeed the issue of navigability *vel non* is so peculiarly one of fact that a determination as to one stream can have little relevancy in determining the status of another.

[94] §§ 10e, 14 and 19 of the Federal Power Act; Michie's 1936 Virginia Code, § 3581 (9).

[1] *Oklahoma* v. *Texas,* 258 U. S. 574, 585, 590–1; *Arizona* v. *California,* 283 U. S. 423, 452; *Crowell* v. *Benson,* 285 U. S. 22, 55.

As this court has said, "each determination as to navigability must stand on its own facts."[2]

The evidence supports,—indeed I think it requires,— a finding that, applying accepted criteria, New River is not, and never has been, in fact navigable. On this record the rule of decision, many times announced by this court, that the concurrent findings of fact of two lower courts, if supported by substantial evidence, will be accepted here, requires affirmance of the judgment. The rule applies not only to evidentiary facts but to conclusions of fact based thereon. Moreover, it has been the basis of this court's decision in a suit involving the question of navigability. Invoking the rule, this court, in *Brewer-Elliott Oil & Gas Co.* v. *United States,* 260 U. S. 77, 86, declined to review a judgment based on a concurrent finding of two lower courts that a stream "was not, and had never been, navigable within the adjudged meaning of that term."

The cases cited for the proposition that where navigability was an issue this court has reconsidered the facts found by the courts below to determine whether they have correctly applied the proper legal tests do not, when the questions involved are understood, lend support to the action of the court in this case.[3]

---

[2] *United States* v. *Utah,* 283 U. S. 64, 87.

[3] The cases cited are *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 699, where this court said with respect to the findings: "We are not, therefore, disposed to question the conclusion reached," by the courts below; *Leovy* v. *United States,* 177 U. S. 621, where a judgment on a jury's verdict was reversed for error in the judge's instructions as to the criteria of navigability; *Economy Light Co.* v. *United States,* 256 U. S. 113, 117, where the court did not reëxamine the facts but affirmed the judgment of the Circuit Court of Appeals, as that court had correctly applied the test laid down in *The Daniel Ball;* and *United States* v. *Holt Bank,* 270 U. S. 49, 55, where the courts below treated the question of navigability as one of local law to be determined by applying the rule adopted in Minnesota, and

The petitioner, in effect, asks this court to convict the courts below of error in determining the credibility, weight and relevance of the evidence. But that determination is peculiarly within their province, as this court has often said. The doctrine applies in this case with especial force. The respondent says, without contradiction, that the Government in its brief in the Circuit Court stated: "It cannot be said that the New River presents a 'clear case' of navigability or non-navigability . . . " Yet this court is asked to ignore concurrent findings on the subject.

If the evidence may fairly support these findings the courts below can be convicted of error only in applying an erroneous rule of law to the facts found.

Examination of the opinions below shows that the courts faithfully followed the decisions of this court in applying the law to the facts. They adopted the definition [4] and applied the criteria this court has announced in appraising the effect of the facts found.

As shown by the cases cited in the margin,[5] a stream to be navigable in fact must have "a capacity for general and common usefulness for purposes of trade and commerce." Exceptional use or capability of use at high water or under other abnormal conditions will not suf-

---

this court, though holding that they applied the wrong standard, as the question was one of federal law, affirmed the findings, instead of remanding the case, since the record disclosed that according to the right standard the water was navigable.

[4] Cf. *The Daniel Ball,* 10 Wall. 557; *The Montello,* 11 Wall. 411, 415; *United States* v. *Oregon,* 295 U. S. 1, 23.

[5] *The Montello,* 20 Wall. 430; *United States* v. *Rio Grande Co.,* 174 U. S. 690; *Leovy* v. *United States,* 177 U. S. 621; *Donnelly* v. *United States,* 228 U. S. 243; *United States* v. *Cress,* 243 U. S. 316; *Oklahoma* v. *Texas,* 258 U. S. 574; *United States* v. *Holt State Bank,* 270 U. S. 49; *United States* v. *Oregon,* 295 U. S. 1; *Harrison* v. *Fite,* 148 F. 781; *Gulf & I. Ry. Co.* v. *Davis,* 26 F. 2d 930, 31 F. 2d 109; *United States* v. *Doughton,* 62 F. 2d 936.

fice.. Moreover,. the stream must be used, or.available to use, "for commerce of a substantial and permanent character." Where the stream "has never been impressed with the character of navigability by past use in commerce, . . . commerce actually in esse or at least in posse is essential to navigability" and "a theoretical or potential navigability or one that is temporary, precarious and unprofitable is not sufficient." The most important criterion by which to ascertain the navigability of a stream is that navigability in fact must exist under "natural and ordinary conditions." Application of these tests by the court below to the evidence in the case led to but one conclusion,—that New River has not been, and is not now, a navigable water of the United States. If the findings below had been the other way, the Government would be here strenuously contending that they could not be set aside, as it successfully did in *Brewer-Elliott Oil & Gas Co.* v. *United States, supra.*

2. The petitioner contends that the application of the accepted tests to the facts disclosed amounts to a ruling of law, and asserts that error in their application is reviewable. As I read the court's opinion, the argument is not found persuasive. While apparently endorsing it in the abstract the court, instead of relying on it, adopts two additional tests in the teeth of the uniform current of authority. If anything has been settled by our decisions it is that, in order for a water to be found navigable, navigability in fact must exist under "natural and ordinary conditions." This means all conditions, including a multiplicity of obstacles, falls and rapids which make navigation a practical impossibility. The court now, however, announces that "natural and ordinary conditions" refers only to volume of water gradients, and regularity of flow. No authority is cited and I believe none can be found for thus limiting the

connotation of the phrase. But further the court holds, contrary to all that has heretofore been said on the subject, that the natural and ordinary condition of the stream, however impassable it may be without improvement, means that if, by "reasonable" improvement, the stream may be rendered navigable then it is navigable without such improvement; that "there must be a balance between cost and need at a time when the improvement would be useful." No authority is cited and I think none can be cited which countenances any such test. It is of course true that if a stream in its natural and ordinary condition is navigable it does not cease to be so because improvements have bettered the conditions of navigation.[6] But the converse is not true,—that where a stream in its natural and ordinary condition is non-navigable, a project to build a canal along its entire course, or dams and locks every few miles, at enormous expense, would render it a navigable water of the United States. Who is to determine what is a reasonable or an unreasonable improvement in the circumstances; or what is a proper balance between cost and need? If these questions must be answered it is for Congress, certainly not for this court, to answer them. If this test be adopted, then every creek in every state of the Union which has enough water, when conserved by dams and locks or channelled by wing dams and sluices, to float a boat drawing two feet of water, may be pronounced navigable because, by the expenditure of some enormous sum, such a project would be possible of execution. In other words, Congress can create navigability by determining to improve a non-navigable stream.

If this criterion be the correct one, it is not seen how any stream can be found not to be navigable nor is it

---

[6] *Economy Light Co. v. United States*, 256 U. S. 113.

scen why this court and other federal courts have been at pains for many years to apply the other tests mentioned when the simple solution of the problem in each case would have been to speculate as to whether, at "reasonable" cost, the United States could render a most difficult and forbidding mountain torrent suitable for the least pretentious form of water traffic. In the light of the court's opinion, if this test be applied to the New River it must, of course, be admitted that by blasting out channels through reefs and shoals, by digging canals around falls and rapids, and possibly by dams and locks, the New River could be rendered fit for some sort of commercial use. What the expense would be no one knows. Obviously it would be enormous. Congress in the past has undertaken to render the river navigable and decades ago gave up the attempt. Still we are told that, at "reasonable" cost, the thing can be done, and so the stream is navigable.

In the light of the grounds upon which the decision of the court is based it hardly seems necessary to comment on the evidence, for it is in the main addressed to issues no longer in the case. The two courts below have analyzed it and examined it in detail and reference to their carefully considered opinions suffices.[7] I think the conclusion reached by the courts below must stand unless the two novel doctrines now announced be thrown into the scale to overcome it.

MR. JUSTICE McREYNOLDS concurs in this opinion.

---

[7] 23 F. Supp. 83; 107 F. 2d 769.