Matthias, J.
The question for determination is whether the Mentor Harbor watercourse flowing into Lake Erie constitutes a navigable body of water. If it is a naturally navigable watercourse it is public. In view of our determination of this question, a consideration of other issues presented in this cause is unnecessary.
The division of watercourses into navigable and non-navigable is merely a method of dividing them into public and private, which is the more natural classification. A modern concept of navigable waters was announced by this court in the recent case of Coleman v. Schaeffer (1955), 163 Ohio St., 202, 126 N. E. (2d), 444. The syllabus of that case is as follows:
“1. In determining the navigability of a stream, consideration may be given to its availability for boating or sailing for pleasure and recreation as well as for pecuniary profit.
“2. Such navigability may be determined on the basis of not only the natural condition of the stream but also of its availability for navigation after the making of reasonable improvements.
“3. In determining the navigability of a stream, consideration may be given to its accessibility by public termini, but the presence or absence of such termini is not conclusive.”
We shall, therefore, determine the navigability of the Mentor Harbor watercourse upon the basis of the following^/ factors: (1) Capacity for boating in its natural condition, (2) accessibility by public termini, (3) capacity for boating after the making of reasonable improvements, and (4) the capacity for boating for either recreation or commerce.
The natural condition of the watercourse in the Coleman *196 case, supra, bore a marked resemblance to tbe condition of tbe waters of Mentor Harbor in the early 1920’s, prior to the time any artificial improvements were made. In the Coleman case it was determined that Beaver Creek which flowed into Lake Erie near the city of Lorain, Ohio, was a navigable watercourse. The owner of the land adjacent to the opening of the creek at the point of its joinder with the lake employed a contractor in 1938 or 1939 to dredge out sand accumulated at the entrance to the creek. Such accumulation was caused by the natural action of the winds and waters of Lake Erie. An examination of the record in the Coleman case substantiates the similarity of the facts there to those herein. At the trial of that action, several witnesses testified regarding the natural condition of Beaver Creek. The appellee’s brief discloses, at pages 64 and 65, testimony (quoted from pages 485 to 487 of the transcript of that ease) which indicated that a sand bar was formed at the mouth of the creek in precisely the same manner as the one which appeared from time to time at the mouth of Mentor Harbor. In order to keep the creek open from year to year, the sand accumulation had to be dredged. Also, the appellee’s brief, at page 16, cites the testimony of another witness (quoted from pages 494 to 497 of the transcript) to the effect that, prior to the dredging of Beaver Creek, the area had the appearance of a swamp or marsh.
A further resemblance in the natural condition of the two watercourses exists. Beaver Creek was navigable only for a distance of two miles from its mouth. At that point the creek became shallow and filled with vegetation and debris to the extent that even the smallest vessel could not navigate it. Similarly, in the instant case, the streams which fed the natural body of water at Mentor Harbor were navigable only for a short distance while that inland body of water itself was fully navigable.
In examining the natural condition of the Mentor Harbor watercourse it was found by the Court of Appeals that a natural passage did in fact exist which connected the watercourse with Lake Erie. Prior to 1926, and before any improvements had been made, a number of vessels gained access to the inland waters by use of such passage. On these occasions the *197 waters were variously used for hunting, fishing and boating. At certain other times of the year, a sand bar was formed by the natural action of the wind and waves with the result that the inland waters were temporarily cut off from direct access to the lake. Periodically, the pressure of the inland waters would break a passage through the bar and the water would flow into the lake. We do not believe that such a natural temporary obstruction destroyed the otherwise navigable character of this watercourse. Navigability may exist despite the obstruction of falls, rapids, sand bars, carries or shifting currents. United States v. Appalachian Electric Power Co., 311 U. S., 377, 409, 85 L. Ed., 243, 61 S. Ct., 291. The same question is discussed in 56 American Jurisprudence, 649, Section 182, where this interesting language is found:
ct* * * Navigability in the sense of the law is not destroyed because the watercourse is interrupted by occasional natural obstructions or portages. * * * There are but few fresh-water rivers which did not originally present serious obstructions to uninterrupted navigation. The vital and essential point is whether the natural navigability of the river is such that it affords a channel for useful commerce. If this is so, the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sand bars. * * *” (Emphasis added.)
In East Bay Sporting Club v. Miller, 118 Ohio St., 360, 161 N. E., 12, this court recognized the principle that a body of water need not flow continuously in order to be properly characterized as a watercourse. The court in paragraph three of the syllabus stated:
“A watercourse is a stream usually flowing in a particular direction in a definite channel having a bed, banks or sides and discharging into some other stream or body of water. It need not flow continuously, and may some times be dry or the volume of such watercourse may some times be augmented by freshets or water backed into it from a lake or bay or other extraordinary causes; but so long as it resumes its flow in a definite course in a recognised channel and between recognised banks, such stream constitutes a watercourse.” (Emphasis added.) The East Bay case is cited and quoted above only for approval *198 and adoption of the definition of “watercourse.” In other respects, that case is to be distinguished from the case at bar. The court in the East Bay case determined, inter alia, that two very shallow streams whose beds and banks were under single ownership and which flowed into Sandusky Bay were private and nonnavigable. The court’s conclusion was based on the fact that neither stream was capable of supporting commercial navigation. As we have pointed out, the test for determining the navigability of a watercourse has been considerably liberalized; and a stream’s capacity for serving as a “highway for commerce ” is no longer the exclusive question for consideration as it was in the East Bay case.
As announced by this court in the Coleman case, a factor which may be considered in determining the navigability of a watercourse is its accessibility by public termini. The presence or absence of such termini is not conclusive. However, it should be observed that the watercourse in question is bounded on the north by the public waters of Lake Erie. In its present condition, the Mentor Harbor watercourse is easily accessible from the lake, and in its natural condition it was accessible, except during the intervals of sand accumulation at the mouth of the channel.
In its present state, the watercourse in controversy consists of a deep channel joining Lake Erie with an elaborate system of extensive artificial lagoons. This watercourse is presently used, and has been used for many years, for sailing and mooring of yachts and various other craft of considerable size. There can be little doubt of the excellence of the place, in its present condition, for recreational boating. In the plaintiff’s own words, “the obvious suitability of the artificial waterways for use by boats is not in dispute.” To emphasize the present capacity of the watercourse for boating, it is interesting to note that the plaintiff admits the mooring of over 60 of its members’ vessels at various places along the lagoons adjacent to the property owned by the defendants herein.
The abundant and continued public use of this watercourse finds strong substantiation in the recent case of State v. Pierce, 164 Ohio St., 482, 132 N. E. (2d), 102. That controversy related to an alleged violation of a township zoning resolution govern *199 ing the use of the Mentor Harbor Lagoon property, the same property with which we are now concerned. Judge Hart, in the opinion in that case at page 485, referred to the acknowledged public use of the property in question which use, it was stated, was for the purposes of hunting, fishing and boating and had continued down through the years without objection from the owners of the land.
The plaintiff here claims that the deepening and widening of the channel in question was an improvement different in kind from the “reasonable improvement” involved in the Coleman case. This is true, the plaintiff contends, because of the large cost of the operation and because of the fact that the construction was undertaken in a “mársh-like” area. Thus, the plaintiff concludes that the dredging and maintenance of its channel do not constitute such a reasonable improvement. Our conclusion is to the contrary. As previously pointed out, the record in the Coleman case confirms the fact that the dredging of Beaver Creek and the dredging of Mentor Harbor were undertakings of a very similar nature. Both operations involved the dredging of sand accumulated because of identical causes. Both operations were conducted in areas which prior to such dredgings had the appearance of swamps or marshes, the latter feeding and draining into the navigable parts of the watercourses.
A natural watercourse does not lose its character as a public watercourse because a part of its channel has been artificially created. Nor is the channel of a naturally navigable watercourse made private because of reasonable improvements put upon it. Hornor v. City of Baxter Springs, 116 Kan., 228, 226 P., 779; Missouri Pacific Ry. Co. v. Keys, 55 Kan., 205, 40 P., 275, 49 Am. St. Rep., 249; Holden v. Robinson Mfg. Co., 65 Me., 215. Similarly, in the instant case, the lagoons, which are artificial extensions of the naturally navigable channel, became a part thereof and are public waters.
As revealed in the Coleman case, supra, this court has extended the eriterea for determining navigability beyond the so-called “commercial usage” test as applied in paragraph two of the syllabus in the East Bay Sporting Club case, supra. To decide navigability solely upon the basis of such use fails to take *200 cognizance of the tremendous increase in the public use of waterways. The capacity of a watercourse for recreational boating is also a factor which may now be considered. The Department of Natural Resources of this state estimates that over one million Ohio citizens make use of our waters. This department also estimates that a total annual expenditure of approximately fifty million dollars is being made in Ohio directly pursuant to such public use. And this increased recreational use of our waters has been accompanied by a corresponding lessening of their use for commerce. We are in accord with the modern view that navigation for pleasure and recreation is as important in the eyes of the law as navigation for a commercial purpose.
We agree with defendant Nozik’s assertion, when he urges us to comply with such a modern concept of navigable waters and to ‘ ‘ declare these waters navigable; not only the waters of the plaintiff, which control the waters of the channel, but all the waters of the entire lagoons. These belong to the people. These are public.”
We hold that the Mentor Harbor watercourse in its present state, including both the channel and the lagoons, is navigable and, hence, public waters.
The judgment of the Court of Appeals is reversed and final judgments are rendered for the defendants.

Judgment reversed.

Zimmerman, Taft, Bell, Herbert and Peck, JJ., concur.