State of ALASKA, Plaintiff–Appellee,

v.

UNITED STATES of America; Bruce Babbitt, Secretary of the Interior; Tom Allen, Alaska State Director, Bureau of Land Management; Robert Barbee, Field Director, Alaska Field

---

Office, National Park Service, and David Allen, Alaska Regional Director, United States Fish and Wildlife Service, Defendants–Appellants.

No. 96–36041.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 1997

Filed Jan. 28, 2000

Jeffrey C. Dobbins, Department of Justice, Washington, DC, for the defendants-appellants.

Joanne Grace, Assistant Attorney General, Anchorage, Alaska, for the plaintiff-appellee.

Before: REAVLEY,[1] BOOCHEVER and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This case involves a dispute between a state government and the federal government over title to the beds of three rivers. The issues arise under the Quiet Title Act.

## FACTS

Judgment was on the pleadings, under Federal Rule of Civil Procedure 12(c), so we take the facts as pleaded.

Three remote Alaskan rivers are at issue, the Kandik, Nation and Black. They are about 200 miles east and a little north of Fairbanks, Alaska, near the border with the Yukon Territory. Alaska was admitted to the Union as a state on January 3, 1959. Navigability as of that date determines which government owns the riverbed. If the river was navigable at statehood, then the state owns the bed; if not, the federal government owns it. It is undisputed that when the Union was created, each of the thirteen original states retained title to the lands covered by navigable waters, and that under the "equal footing doctrine" each new state succeeds upon statehood to the federal interest in these lands. The Submerged Lands Act gave Alaska title to the beds of navigable rivers on January 3, 1959.[2]

The State of Alaska pleads that the three rivers were navigable at statehood. The United States does not deny the fact. That would be the end of the case, but for the intricacies of the Quiet Title Act.[3] Under that statute, as is explained in more detail below, the federal government takes the position that its sovereign immunity

---

1. The Honorable Thomas M. Reavley, Senior United States Circuit Judge for the 5th Circuit, visiting judge.

2. 43 U.S.C. §§ 1301–1315; *State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401 (9th Cir.1989).

3. 28 U.S.C. § 2409a.

shields it from the state government's claims until the federal government itself makes a claim. Because Alaska is very large, much of it is wilderness, and there are innumerable waters, the federal government has not had time yet to determine what claims it wishes to make. Therefore, the state government must wait until the federal government makes a claim, if it ever does, before settling whether it has title.

### The Kandik and Nation Rivers

Alaska pleads that the United States has asserted claims to two of the three rivers. The context was a dispute with a native corporation after the Alaska Native Claims Settlement Act was passed. That act provided that Alaska Native regional groupings and villages were to establish corporations, which would receive about $1 billion in cash and forty million acres in land.[4] Their land selections were limited to those lands not already owned by someone else, such as the State of Alaska.

When Doyon, Ltd., a regional corporation in Interior Alaska, made its land selections, the Bureau of Land Management ("BLM") made a decision that the Kandik and Nation Rivers were nonnavigable at statehood. Doyon did not claim the rivers. What it claimed was that the rivers were navigable at statehood, so the state owned them. Doyon's interest was in claiming navigability, so that it could get more land outside the riverbeds, and not have the riverbeds charged against its acreage entitlement. But the Bureau of Land Management claimed that the rivers were nonnavigable at statehood, so that Doyon would be stuck with them and its dry land acreage entitlement reduced accordingly.

Doyon appealed the BLM decision. The administrative law judge took extensive evidence and decided in favor of Doyon. He found that the rivers were navigable at statehood, so the state owned them, they were unavailable for selection by Doyon, and they could not count against Doyon's entitlement.

The area has temperatures varying from 70 below Fahrenheit to 90 above. Much of the time all water is frozen, but when it rains, permafrost prevents water from soaking into the soil. The streams vary a great deal, sometimes braided and nearly dry, sometimes flooding, sometimes blocked by log–jams, sometimes open and four or five feet deep. Few if any people lived in the area in the 1950's, but people did live there by hunting, fishing, trapping and trading in the 1930's, 1940's, and 1960's. The Kandik was used by a man who had a supply contact with the International Boundary Commission in 1910–1912 to pole and line two tons of supplies upstream to the Yukon border by scow. It took a month to get the supplies upstream, but only six hours to get down, because a cloudburst immediately before the return trip made the river high and swift. The ALJ concluded that it was likely that supplies were similarly brought up the Nation River to Hard Luck Creek.

Fur prices stimulated the heaviest trapping in the area in the 1920's, 1930's, and 1940's. During that period sternwheelers would deliver supplies at the mouths of the Nation and Kandik, and the trappers would haul them upstream by boat or canoe in the summer, or dogsled in the winter. There were two known trappers on the Kandik in the 1920's and 1930's, and both poled boats up the stream. A trapping family used a boat with an inboard motor to get supplies up the Nation. Several other trappers used boats and canoes to get supplies up the Nation and furs down ( to be taken to Eagle for sale to middlemen) in the 1930's.

The ALJ found that after statehood, the Kandik and Nation became popular recreational streams. This popularity was measured by Alaska standards, with at least two parties on the Kandik in 1978, when the evidence was taken, and three parties in one day on the Nation.

---

4. 43 U.S.C. § 1601 *et seq.*

The ALJ made a finding of fact that both rivers, the Kandik and Nation, were "navigable all the way from the Yukon River to the Canadian border." He expressly determined that the test was navigability for purposes of title in the State of Alaska; navigability in each river's natural condition at the time Alaska obtained statehood. Because there were (and are) no roads in the area, people bringing supplies upstream or furs and game downstream could hardly put their canoes on car–tops and drive them from one good channel to another; they had to get them from the mouth to their cabins, and the cabins to the mouth, dealing with shallows by such means as poling and lining. Although a decline in fur prices had caused all activity on the rivers to cease as of the time of statehood, their use before and after showed that they remained navigable. That the rivers were frozen for seven months of the year did not defeat navigability, because the rivers were the only means of ground transport (as opposed to bush planes) between breakup and freeze-up.

The BLM, having lost on its claim of nonnavigability before the ALJ, filed exceptions, maintaining its position of nonnavigability which would cause the riverbeds to be charged against Doyon's entitlement. The Alaska Native Claims Appeal Board adopted the ALJ's findings, conclusions and recommended decision.[5] The BLM took exception on the basis that use by a few trappers was not enough to establish historical navigability. The Appeal Board held that because there were no settlements on either river at any time, that a few trappers used the rivers showed the existence rather the nonexistence of navigability. During the twenty years before fur prices dropped, 21 trappers used the Kandik, and 7 used the Nation, by the canoes, motor boats and pole boats that were regularly used to transport freight in that region, which in the Alaska wilderness was enough to establish historical navigability.

5. 86 Interior Dec. 692 (1979).

## The Black River

As explained above, Doyon won its case establishing that the Kandik and Nation Rivers were navigable at statehood, so the rivers belonged to the State of Alaska and could not be counted against Doyon's acreage. The Bureau of Land Management had fought the case, claiming that the Kandik and Nation were nonnavigable at statehood, so belonged to the United States (and after its land selection, Doyon). After Doyon won the Kandik and Nation Rivers case, the BLM had its historian prepare a study of the Black River. It is another obscure river in the exceedingly lightly populated eastern part of Interior Alaska.

The Black flows about 300 miles toward the northwest, from some mountains north of the Yukon, past an abandoned Indian village called Salmon Village, through the Yukon Flats near the presently occupied village of Chalkytsik, and into the Porcupine River about 25 miles upstream from where the Porcupine flows into the Yukon. Before the Alaska Purchase in 1867, the Hudson's Bay Company maintained an important post at Fort Yukon just below the confluence of the Porcupine and Yukon Rivers, and mapped the Black River, so probably was buying furs from trappers up the Black. The economy probably declined after the United States purchased Alaska, because the War Department compelled the Hudson's Bay Company to move its trading post up the Porcupine River to Rampart House, on the other side of the Yukon Territory border.

During the first half of the century, local Athabascans, the Tranjik Kutchin, traveled upriver in the fall in canoes for winter hunting in the headwaters, and came downriver in the spring for fishing. White trappers and prospectors explored the area beginning in the first decade of the twentieth century, and operated several trading posts from time to time along the river. Trading posts sold some supplies to

the local Athabascans in exchange for furs they trapped.

After a school was built at Chalkytsik (formerly the summer fish camp known as Fishhook Village), the local Indians began settling there year round. By 1945, Chalkytsik had about 80 people, and by 1970, the population had risen to about 95 people, with 26 houses, two stores, and two churches. Pilots started flying bush planes in around 1940, and by 1970 bush planes were the usual means for trappers to bring in supplies and bring out their furs. Trapping was the main industry, but a considerable portion of village income was earned by firefighting. In the summer, when trapping and hunting are no good, the villagers made regular boat trips down the Black River and the Porcupine to Fort Yukon to visit relatives and fly out for jobs. But the river continued to be used for these purposes as well.

The BLM State Director decided in 1980 that the Black River was navigable at statehood from the Porcupine up to Wood River, based on its historian's report. Part of the river consists of dead-end sloughs and oxbow lakes during the summer, but at the request of the Village of Chalkytsik, the BLM determined that they were navigable too.

The State of Alaska's complaint pleads, and the United States admits, that the United States "does not consider itself bound" by these past determinations that all three rivers were navigable at statehood. The state claims that its inability to ascertain with finality whether the United States concedes navigability at statehood for purposes of title in the state impedes its land and water resource management and its ability to provide public information. It therefore sought a declaratory judgment against the United States and the native regional and village corporations owning land along the rivers, Doyon and Chalkytsik, to establish that the three rivers as described above were navigable at

statehood, and that the state held title to their beds.

The federal government and the Native corporations moved to dismiss. Their theory was that because the United States was not at that time asserting a claim, sovereign immunity had not been waived under the Quiet Title Act, so the court had no jurisdiction to establish that the United States' claim, if it ever chose to assert one, was invalid. The Native corporations stood to obtain title to the riverbeds, apparently in addition to the title they had already obtained to other land on the assumption that they would not receive the riverbeds, if the rivers were held to be nonnavigable at statehood.

The district judge denied the motion to dismiss.[6] He reasoned that "the lack of a binding determination regarding the navigability of the affected rivers leads precisely to the kind of cloud on the State's title that quiet title statutes exist to remedy," and there was a ripe controversy because the United States refused to bind itself by disclaiming an interest, and "behind the rhetoric ... there was in fact a dispute between the parties over ownership of the riverbeds." The United States refused to admit or deny the State of Alaska's averment that the three rivers were navigable at statehood, on the theory that navigability was a pure question of law. The district court held that it was a question of fact or a mixed question, so that it had to be denied or else be deemed admitted. Less abstractly, the district judge characterized the United States as "playing dog in the manger." That refers to a dog that finds food for chickens and ducks in a manger, does not eat it, but keeps the ducks and chickens out so that they cannot eat the food to which they are entitled. "When the United States casts itself in the role of dog in the manger, [it has] made a sufficient 'claim' to the grain it will not consume" for its claim to be

---

**6.** The United States filed an interlocutory appeal, before judgment was entered. It was dismissed because there was no final judg-

ment. *Alaska v. United States,* 64 F.3d 1352 (9th Cir.1995).

cognizable under the Quiet Title Act, and "we should send it on its way." Judgment was entered quieting title to the riverbeds of the three rivers in the State of Alaska based on navigability at statehood. The United States has appealed, but the Native Corporations affected have not.

## ANALYSIS

██ We review dismissal on the pleadings *de novo*.[7]

### I. "Claims an interest."

The Quiet Title Act allows suits against the United States to adjudicate disputed titles in real property "in which the United States claims an interest."[8] The United States argues that because it refused to take a position in its answer as to whether it claimed or did not claim an interest in the riverbeds, they were not land in which it "claims an interest," so the district court lacked jurisdiction.

██ The United States' argument is that it currently makes no formal assertion of any claim to the rivers, that the final determinations in the disputes regarding Doyon's objection to counting the Kandik and Nation riverbeds against its acreage established that it had no claim as of that time, and it has not interfered with any assertion of a claim or usage by the state of the three rivers. The United States also argues that until it "claims an interest," the dispute is not ripe for purposes of Article III jurisdiction. We need not consider the Constitutional argument, because it is in this case nothing more than a restatement of the statutory argument, and the case can be resolved fully on the statutory questions. The Quiet Title Act must be construed strictly because it waives sovereign immunity,[9] but that is too general a point to resolve the case. There is no controlling authority closely in point, and neither side cites any, on the question of what conduct by the United States amounts to "claim[ing] an interest" for purposes of Quiet Title Act jurisdiction.

The United States argues as a matter of policy that we should be chary of allowing the State of Alaska to burden the federal government by requiring it to study all the waters of its expanse on pain of losing title to them. Basically it says it *has* to be a "dog in the manger," because the State of Alaska is too big for it to know about in any detail. This is a serious point, though in the forty years since statehood, with its enormous fleets of federal aircraft, satellite photographs, archives of aerial photographs, and large staffs of employees patrolling Alaska, the federal government has not been entirely helpless in its ability to make decisions about its interests in the state.

There is also a serious policy concern in favor of allowing resolution of disputes based on the United States' inchoate claim to everything in Alaska but what it has disclaimed. Eventually all the witnesses will be dead, reducing the reliability of litigation. Someone who used one of these rivers in 1959 at age 20 is now 60. The population in the area was so sparse at all relevant times—probably no more than a couple of hundred people who might have used the three rivers during the relevant time, most too young to have relevant knowledge or too old to have survived the forty years since statehood—that a few deaths by old age can remove most or all the knowledgeable witnesses. Also, a state entitled as of 1959 to all the incidents of ownership in its rivers, yet still deprived of clear title forty years later, is effectively deprived of what it is entitled to under the equal footing doctrine.

For the Nation and Kandik Rivers, there can be no question that the United States did in fact actively assert a claim of ownership. The Bureau of Land Management took the position in the Doyon case, before the administrative law judge and

---

7. *McGann v. Ernst & Young,* 102 F.3d 390, 392 (9th Cir.1996).

8. 28 U.S.C. § 2409a(a).

9. *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).

before the Alaska Native Claims Appeal Board, that the Kandik and Nation were *not* navigable at statehood. Its argument for why that should not satisfy the "claims an interest" requirement of the Quiet Title Act floats away when we try to get hold of it. The United States government, by its own litigators, in a formal, considered way, for the purpose of reducing the amount of dry land it had to give Native corporations, *did* claim an interest (which would pass to Doyon) in the riverbeds.

That the United States does not say the same thing now as then does not eliminate the cloud on the State of Alaska's title that its claim created. After all, the federal government has now taken three positions: (1) the rivers were not navigable at statehood, so we retained ownership, and now Doyon owns them so they reduce the amount of dry land Doyon can get from us; (2) the rivers were navigable at statehood, so we did not retain title and they do not count against Doyon's acreage (after the BLM lost at two levels in the administrative adjudication against Doyon); (3) we refuse to take a position on whether the rivers were navigable at statehood, so the State of Alaska cannot settle title one way or the other. These positions are not consistent, and have nothing in common except that (1) and (3) served whatever was the federal government's interest at the time. There is apparently nothing to stop the United States from taking again the position at any time in the future, that the rivers were not navigable at statehood. Its first position, against Doyon, establishes that at least one federal bureau's personnel believed that that is the correct position.

█ By reading the statute itself and performing the traditional exercise of attributing a rational purpose to the legislature, we can attribute to Congress a purpose of furnishing a means by which state governments can remove clouds on their title created by federal assertions of claims.[10] The United States has claimed nonnavigability, implying federal ownership, before, and expressly reserves the freedom to assert it again. If the state cannot get Quiet Title Act jurisdiction, then the potential claim will lurk over the shoulder of state officials as they try to implement a coherent management plan for state waterways. To oppose any management initiative that differed from federal policies, the federal government could revive its claim, and thereby prevent state regulation of the affected river and destroy coherence in state policy to the extent that its program for some rivers was coordinated with its program for others. Congress expressly provided a scheme by which the state governments can quiet titles against federal claims. When the state governments were frustrated by the statute of limitations in the Quiet Title Act, Congress removed it to give states more power to quiet title against the federal government.[11] Congress must have meant to empower state governments to eliminate clouds on their claimed title to state lands, yet it would have accomplished very little indeed if the United States could obtain a dismissal of any state quiet title suit by adopting a litigation position of refusing to state whether it asserted a claim or not.

Both sides urge us to examine snippets of legislative history. Even were legislative history to be determinative, there is nothing in any of the snippets cited answering the question of just what the United States must do to "claim[ ] an interest" for purposes of Quiet Title Act jurisdiction. The United States quotes one snippet that says "claims an interest," as the statute does, as though the identical words in the legislative history somehow explain or strengthen the words in the statute. They do not.

The United States argues that because the Alaska Native Claims Appeal Board made the final decision for the Department of the Interior,[12] once it decided the case

---

10. *Longview Fibre Co., v. Rasmussen,* 980 F.2d 1307, 1311 (9th Cir.1996).

11. P.L. 99–595, 100 Stat. 3351 (1986).

12. 43 C.F.R. § 4.1(b)(5) (1980).

against the BLM, the BLM's claim was no longer the position of the Department. That argument does not go far enough, because *until* the Board ruled, the BLM's position *was* the position of the Department. There can be no question that from the time the BLM asserted its position until the time Doyon defeated it before the Board, the Department actively and positively asserted claims on behalf of the United States to the Kandik and Nation riverbeds. And a past assertion of a claim by the Bureau of Land Management has been held to be sufficient to amount to an assertion of a claim for statute of limitations purposes.[13]

 Once the government has formally asserted a claim to an interest in land, a state government is entitled to treat the land as "real property in which the United States claims an interest"[14] regardless of whether the United States has ceased actively to assert its claim. Because the United States has asserted a claim, and retains authority to assert it again, the past assertion operates as a present cloud on the state's title. If the United States does elect to drop its claim, it can unilaterally destroy jurisdiction over the Quiet Title Act suit simply by filing a disclaimer.[15] Once it files a section (e) disclaimer pursuant to the statute, then it becomes plain that it no longer "claims an interest" for purposes of section (a). The coherent scheme of the Quiet Title Act requires the filing of a section (e) disclaimer to eliminate the title dispute arising out of the government's claim.

By contrast, in the case at bar, the United States once actively claimed in litigation that it owned the riverbeds, and in this litigation when put to the test by the district court refused to file a disclaimer, because it wanted to retain the power to assert a claim in the future. Since the statute provides that the United States can

destroy jurisdiction by filing a disclaimer, it would be illogical to construe it to mean that the United States can also destroy jurisdiction by filing a refusal to make a disclaimer.

Our recent decision in *Leisnoi, Inc. v. United States*[16] facilitates decision. In *Leisnoi*, the federal government had never at any time asserted a claim. A Native corporation sued to quiet title because a private individual had filed a lawsuit in state court asserting that the Native corporation did not properly obtain its conveyance from the United States, and that the United States should decertify the Native corporation and revoke its conveyance. In contrast to the case at bar, the United States expressly and consistently denied that it had any claim, and filed a disclaimer of interest in the Quiet Title Act lawsuit. We held that the case was properly dismissed for lack of jurisdiction, and that the district court properly refused to confirm the disclaimer because it had no jurisdiction to do so, because the government had never disputed the Native corporation's title. Although the private claimant purported to dispute the title on behalf of the United States, at the time the Quiet Title Act lawsuit was dismissed the state court had rendered judgment against his claim and expressly removed any claim the private claimant had placed on the Native corporation's title.

By contrast with *Leisnoi*, in the case at bar the United States rather than a private party has disputed the State of Alaska's title. Nor has it clarified and dissipated any ambiguity in its previous assertion of title to the Nation and Kandik Rivers. In *Leisnoi* the United States attempted to file a formal disclaimer of all interest under the Quiet Title Act.[17] As is often true in cases filed by private citizens nominally on behalf of the United States, the private citizen's claim did not

---

**13.** *See, e.g., Knapp v. United States,* 636 F.2d 279, 283 (10th Cir.1980).

**14.** 28 U.S.C. § 2409(a).

**15.** 28 U.S.C. § 2409a(e).

**16.** *Leisnoi, Inc. v. United States,* 170 F.3d 1188 (9th Cir.1999).

**17.** 28 U.S.C. § 2409a(e).

at all represent any position that the United States had ever taken, and there was and had been no dispute at all between the United States and the defendant in the "on behalf of" lawsuit.

By contrast, in the case at bar, the United States itself has formally claimed that the Kandik and Nation were nonnavigable at statehood so that it retained title and the State of Alaska did not obtain title. The United States formally admitted the State of Alaska's averment that the United States "does not consider itself bound for purposes of title by the BLM's past navigability determinations."[18] That is, the United States pleaded that it did not consider itself bound to maintain its sometime position that the rivers were navigable. In response to the State of Alaska's averments that the Kandik, Nation and Black were navigable at statehood, the United States pleaded that these allegations of navigability "consist of conclusions of law not requiring an answer."[19] This was not merely an early pleading before the United States settled on its position; it was the considered position of the United States maintained to preserve what it saw as a right to elect at any time in the future to assert nonnavigability. The Supreme Court has held that navigability "involve[s] questions of law inseparable from the particular facts to which they are applied," and navigability of a particular river "is, of course, a factual question."[20] Thus the district court was correct under Rule 8[21] in treating the government's "failure to deny" the factual averments of navigability as admissions of the fact, and the express reservation of its right to change its position and assert nonnavigability as maintaining the dispute. The United States

can no more refuse to answer the mixed question averment of navigability than a personal injury defendant could refuse to answer the mixed question averment that it had acted negligently. There remains a live dispute between the United States and the State of Alaska regarding whether the Nation and Kandik Rivers were navigable at statehood. That suffices for jurisdiction under subsection (a) of the statute.[22]

■ The United States, in its brief before us, argues that "even if the question of navigability requires an answer, the district court should have permitted the United States to amend its answer to provide one." That would be a strong argument, had the United States asked the district court for leave to amend. But it did not. Even after it lost in district court on navigability, and filed a motion for reconsideration, the United States did not seek leave to amend. The United States stuck so firmly to its contention that it did not have to answer the navigability averment, that it never asked for permission to answer the averment even after the district court decided it had to answer. Where a party never asked for permission, its argument that the "district court should have permitted" is without force.

■ "We have permitted only narrow and discretionary exceptions to the general rule against considering issues for the first time on appeal. They are (1) when review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process...."[23] In two other cases, *Black* and *Jackson*, we held that where a party did not seek leave to amend a pleading in the lower court, we would not remand with instructions to grant leave to amend.[24] Where a party does not ask the

---

18. Amended complaint ¶ 30; Answer ¶ 30.

19. *Id.* ¶¶ 21, 22, 23.

20. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 404–05, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *see also New York State Dept. of Environmental Conservation*, 954 F.2d 56, 60 (2d Cir.1992).

21. Fed.R.Civ.P. 8(d).

22. 28 U.S.C. § 2409a(a).

23. *Jovanovich v. U.S.*, 813 F.2d 1035, 1037 (9th Cir.1987).

24. *Black v. Payne*, 591 F.2d 83, 89 (9th Cir. 1979); *Jackson v. American Bar Association*, 538 F.2d 829, 833 (9th Cir.1976).

district court for leave to amend, "the request [on appeal] to remand with instructions to permit amendment comes too late."[25] This case does not fall within the exception for miscarriages of justice and preserving the integrity of the judicial process. The United States has at various times taken positions on both sides of the proposition that the Kandik and Nation Rivers were navigable at statehood. There is no injustice in holding the United States to a determination of navigability based upon its obdurate refusal to answer the averment of navigability; the United States reached the same conclusion in the determination of the Alaska Native Claims Review Board, an adjudicative organ of the Department of the Interior.

### The Black River

 The Black River is a harder case for the State of Alaska, because the federal government held off on asserting its position until after Doyon's administrative litigation was resolved as to the Nation and Kandik, and then threw in the towel without forcing Doyon through another administrative proceeding. It is plain from the record that the United States applied the administrative decision for the Kandik and Nation Rivers in deciding what its position would be on the Black River, and would probably have followed it had it come out the other way. That cuts in favor of jurisdiction, because the state officials know that the federal government considers the Black to be like the Kandik and Nation, and if it asserts a claim on those rivers, it will most probably assert a claim on the Black. But the United States has never, so far as the record shows, expressly asserted a claim on the Black, which cuts against jurisdiction.

Arguably under our decision in *Shultz v. Department of Army*,[26] the United States has not done enough to make a cause of action regarding the Black River to accrue, for purposes of the statute of limitation. But it is possible that a claim is substantial enough for jurisdiction even if limitations against a private litigant has not yet begun to run. We distinguished between easement cases like *Shultz* and disputes over title that would give rise to possessory rights in *Michel v. United States*.[27] Also, because Congress in 1986 eliminated the Quiet Title Act statute of limitations where state governments bring the suits, the "claims an interest" language in the jurisdiction-granting subsection[28] has been cut loose from the jurisdiction-terminating provision barring private actions unless brought within twelve years of "the date upon which it accrued."[29]

We have held that the statute of limitations portion of the Quiet Title Act "does not require that the United States communicate its claim in clear and unambiguous terms," which argues in favor of jurisdiction, but that a cause of action does not accrue for limitations purposes "when the United States' claim is ambiguous or vague."[30]

Our recent decision in *Leisnoi*[31] seems to us to be an insuperable barrier to jurisdiction regarding the Black River. *Leisnoi* holds that because subsection (a) of the Quiet Title Act requires that title be "disputed,"[32] there must be a dispute between the United States and the plaintiff in the Quiet Title Act suit.[33] There has never

---

**25.** *Jackson*, 538 F.2d at 833.

**26.** *Shultz v. Department of Army*, 886 F.2d 1157 (9th Cir.1989) (even building a fence, gate, and guardhouse were not enough to put a person on notice that the army claimed the right to control a right of way).

**27.** *Michel v. United States*, 65 F.3d 130 (9th Cir.1995).

**28.** 28 U.S.C. § 2409a(a).

**29.** 28 U.S.C. § 2409(g).

**30.** *State of California v. Yuba Goldfields, Inc.*, 752 F.2d 393, 397(9th Cir.1985).

**31.** *Leisnoi, Inc. v. United States*, 170 F.3d 1188 (9th Cir.1999).

**32.** 28 U.S.C. § 2409a(a).

**33.** *Leisnoi*, 170 F.3d at 1191–92.

been a dispute between the United States and the State of Alaska over the Black River. The United States reserves the right to start a dispute, and has not disclaimed any interest. There may well be a dispute at some time, considering that the federal position on the Black simply followed the administrative determination on the Kandik and Nation, and it has taken conflicting positions on those rivers. But whatever dispute there may be, it has not yet occurred. The express federal reservation of rights is not to revert to a position previously held, as with the Kandik and Nation, but to adopt a position never previously taken.

This is not to say that the State of Alaska ought not to be able to sue to quiet title in the Black River. Arguably it should. Forty years after statehood, it ought to be able to manage its property knowing what is its property. And the litigation, if there is to be litigation, ought to take place while witnesses with personal knowledge are still alive to testify. The district court's concerns about the federal "dog in the manger" posture are well taken. But the statutory language as construed in *Leisnoi* nevertheless leaves the district court without jurisdiction to quiet title in the Black River. A title cannot be said to be "disputed" by the United States if it has never disputed it. The statute as it stands does not enable us to repair this practical problem. We are compelled to reverse the district court's judgment insofar as it spoke to the Black River, and remand the case so that the claim can be dismissed for lack of jurisdiction as to the Black River.

**34.** 28 U.S.C. § 2409a(a).

**35.** Appellant's Brief, 40–41.

**36.** *State of Alaska v. Babbitt,* 182 F.3d 672 (9th Cir.1999).

**37.** *Montana v. United States,* 450 U.S. 544, 551–52, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Shively v. Bowlby,* 152 U.S. 1, 49, 14 S.Ct. 548, 38 L.Ed. 331 (1894); *Pollard v.*

## II. Indian lands.

The United States argues that, to the extent we affirm, the district court should be required to reword its judgment to exclude Indian lands from its scope. The Native corporations have not appealed.

The United States argues that because the Quiet Title Act does not permit suit against it to quiet title with respect to "trust or restricted Indian lands,"[34] the district court erred in not entering a judgment excluding such lands.[35] The United States did not plead or otherwise allege that there are any trust or restricted Indian lands affected by the judgment, but its answer did say that "preliminary research indicates the possible presence of individual landowners or Native allotment claimants on the specified rivers."

A "colorable" claim that land is Indian trust or restricted land defeats Quiet Title Act jurisdiction, but a claim that is not even "colorable" does not.[36] There can be no Indian lands in the bed of a navigable river, because such underwater lands as a matter of law were held in trust for the state by the United States prior to statehood, and passed to the State of Alaska on statehood.[37] The Alaska Native Allotment Act did not reserve title to submerged lands for future allotment awards.[38] Lands granted as Native allotments exclude lands under navigable waters.[39]

There being no colorable claim to any Indian lands in the beds of the Kandik and Nation Rivers, the district judge did not err in rejecting the United States' proposed language in the judgment.

*Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845).

**38.** 43 U.S.C. §§ 270–1, 270–3 (1970) (repealed in 1971).

**39.** *In re Frank Rulland,* 41 IBLA 207 (1979); *In re Hermann Kroener,* 124 IBLA 57, 62 (1992); *State of Alaska,* 119 IBLA 260, 271 (1991).

## CONCLUSION

The judgment is AFFIRMED with respect to the Kandik and Nation Rivers and REVERSED with respect to the Black River. As to the Black River, the matter is remanded to the District Court with instructions to dismiss for lack of jurisdiction.